COMMISSIONER OF INTERNAL REVENUE *v.* PORT-
LAND CEMENT COMPANY OF UTAH

No. 79–1907.   Argued January 13, 1981—Decided March 3, 1981

POWELL, J., delivered the opinion for a unanimous Court.

*Stuart A. Smith* argued the cause for petitioner. With him on the briefs were *Solicitor General McCree, Acting Assistant Attorney General Murray, Jonathan S. Cohen,* and *David English Carmack.*

*Dennis P. Bedell* argued the cause for respondent. With him on the brief were *Mark L. Evans, John J. Martin,* and *Glen E. Fuller.**

JUSTICE POWELL delivered the opinion of the Court.

This case concerns the depletion deduction taken under § 611 of the Internal Revenue Code of 1954, 26 U. S. C. § 611, by a company that mines and manufactures Portland cement. The question presented is whether the company's "first marketable product," for the purpose of determining gross income from mining by the proportionate profits method, is cement, whether sold in bulk or in bags, or only cement sold in bulk.

I

Respondent, Portland Cement Co. of Utah, is an integrated miner-manufacturer. It mines argillaceous limestone rock, known in the trade as cement rock, and it manufactures the rock into Portland cement.[1] As a miner, respondent is al-

---

*Richard A. Freling* and *David G. Glickman* filed a brief for Centex Corp. as *amicus curiae* urging affirmance.

[1] As suggested by the term "integrated miner-manufacturer," respondent's operation has two phases: mining and manufacturing. The mining phase begins with the blasting of cement rock from the face of respondent's quarry. After crushing the rock into pieces about one cubic inch in size, respondent transports the rock to its processing plant, which is about 12 miles from its quarry in Utah. Respondent then grinds the

lowed by § 611 (a)[2] to deduct from its taxable income an amount that permits it a recoupment of capital investment in the depleting mineral. Section 611 (a) provides:

> "In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary. . . ."

The amount which respondent may deduct is a percentage of its "gross income from the property." 26 U. S. C.

---

rock finely and adds water, producing a mud known as "slurry." Respondent feeds the slurry from tanks into fired kilns that heat it into a hard glass-like substance known as a "clinker." Once the clinker is cooled, respondent grinds it with gypsum to produce finished Portland cement. The finished cement is placed in storage silos to await sales to customers.

There is no dispute as to when respondent's mining phase ends and its manufacturing phase begins. Section 613 (c) (2) of the Code, 26 U. S. C. § 613 (c) (2), defines "mining" to include "not merely the extraction of the ores or minerals from the ground but also the treatment process considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which such treatment processes are applied thereto as is not in excess of 50 miles . . . ." Paragraph (4) (F) of § 613 (c) describes the treatment processes considered as mining to be—"in the case of calcium carbonates and other minerals when used in making cement—all processes (other than preheating of the kiln feed) applied prior to the introduction of the kiln feed into the kiln, but not including any subsequent process."

When these definitions are applied, respondent's mining phase ends when the slurry has been produced and is stored in tanks to await introduction into the kilns. The Tax Court so found, 36 TCM 578, 579 (1977), ¶ 77.137, p. 582, P–H Memo TC, and the parties agree.

[2] All citations to the Internal Revenue Code are to the Code of 1954, unless stated otherwise.

160

§ 613 (a).[3]  In respondent's case, gross income from property means "gross income from mining." [4]  Thus, respondent may deduct from its taxable income a percentage of the gross income it receives from mining.

If respondent were only a miner and therefore sold the product of its mining, respondent's gross income from mining would be the receipts from its sales.  But as an integrated miner-manufacturer, respondent itself uses the product of its mining.[5]  Respondent therefore has no actual gross income from mining and must base its depletion deduction upon a constructive gross income from mining.  See *United States v. Cannelton Sewer Pipe Co.,* 364 U. S. 76, 86 (1960).

The Commissioner of Internal Revenue, petitioner here, has prescribed in Treasury Regulations two methods of determining constructive gross income from mining.  If other miners in the industry sell the product of their mining on an open market, then miners who do not sell their product must use "the representative market or field price" to compute their constructive gross income from mining.  Treas. Reg. § 1.613–4 (c), 26 CFR § 1.613–4 (c) (1980).  If other miners do not sell their mining product and a representative market

---

[3] Section 613 (a) reads in pertinent part:

"In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property . . . ."

For tax years beginning on or prior to October 9, 1969, the percentage specified by subsection (b) of § 613 for the depletion of calcium carbonates, the chemical name for cement rock, was 15%.  26 U. S. C. § 613 (b)(7) (1964 ed.).  For tax years beginning after October 9, 1969, the percentage was 14%.  26 U. S. C. § 613 (b)(7).

[4] Title 26 U. S. C. § 613 (c)(1) (1976 ed., Supp. III) provides: "The term 'gross income from the property' means, in the case of a property other than an oil or gas well and other than a geothermal deposit, the gross income from mining."

[5] See n. 1, *supra.*

or field price cannot be determined, as is the case in the integrated cement industry, then constructive gross income from mining must be determined by the "proportionate profits method." § 1.613–4 (d). In addition to providing these two methods, the Commissioner also has provided that a taxpayer may compute a constructive gross income from mining by any other method that, upon the taxpayer's request, the Commissioner determines to be more appropriate than the proportionate profits method under the taxpayer's particular circumstances. § 1.613–4 (d)(1)(ii).[6] For each of the tax years at issue in this case, respondent used the proportionate profits method to compute its constructive gross income from mining.[7]

The proportionate profits method uses the costs of and proceeds from the taxpayer's "first marketable product" to derive the taxpayer's constructive gross income from mining. The principle of the method is that each dollar of the total costs which the taxpayer incurs to produce, sell, and transport its first marketable product earns the same proportionate part of the proceeds from sales of that product. § 1.613–4 (d)(4)(i). The objective of the method is to identify— from among the total proceeds from sales of the first marketable product—that portion of the proceeds that has been earned by the costs which the taxpayer incurred in its mining operations. To identify that portion of the proceeds, the formula requires the taxpayer to apportion the total proceeds from its first marketable product between mining income and total income in the same ratio as its mining costs bear to its total costs. The amount of proceeds which bears the same

---

[6] The Commissioner himself has suggested two other methods that a taxpayer may propose as more appropriate than the proportionate profits method. See 26 CFR §§ 1.613–4 (d)(1)(ii)(e), (5), (6), (1980).

[7] The three tax years at issue in this case are those ending on March 31, 1970, 1971, and 1972.

relationship to total proceeds as mining costs bear to total costs is the taxpayer's constructive gross income from mining.[8]

On its returns for the tax years in question, respondent took the position that its first marketable product was cement sold in bulk. Respondent sells most of its cement in bulk, by loading finished cement directly from silos into customers' trucks or railroad tank cars. But respondent also sells cement in bags to customers who want to buy relatively

---

[8] The Treasury Regulations explain the proportionate profits method this way:

"(i) The objective of the 'proportionate profits method' of computation is to ascertain gross income from mining by applying the principle that each dollar of the total costs paid or incurred to produce, sell, and transport the first marketable product or group of products (as defined in subdivision (iv) of this subparagraph) earns the same percentage of profit. Accordingly, in the proportionate profits method no ranking of costs is permissible which results in excluding or minimizing the effect of any costs incurred to produce, sell, and transport the first marketable product or group of products. . . .

"(ii) The proportionate profits method of computation is applied by multiplying the taxpayer's gross sales (actual or constructive) of his first marketable product or group of products . . . by a fraction whose numerator is the sum of all the costs allocable to those mining processes which are applied to produce, sell, and transport the first marketable product or group of products, and whose denominator is the total of all the mining and nonmining costs paid or incurred to produce, sell, and transport the first marketable product or group of products . . . . The method as described herein is merely a restatement of the method formerly set forth in the second sentence of Regulations 118, section 39.23 (m)–1 (e)(3) (1939 Code). The proportionate profits method of computation may be illustrated by the following equation:

$$\frac{\text{Mining Costs}}{\text{Total Costs}} \times \text{Gross Sales} = \frac{\text{Gross Income}}{\text{from Mining}}$$

26 CFR §§ 1.613–4 (d)(4)(i), (ii) (1980).

The Tax Court has captured the gist of the method in fewer words: "The purpose of the proportionate-profits formula is to separate the sales price of a product into its mining and nonmining components." *North Carolina Granite Corp.* v. *Commissioner,* 56 T. C. 1281, 1291 (1971).

small quantities.[9]  Cement is bagged by running it from the storage silo into a bin above a bagging machine, which then pours the cement into bags and seals them.  The cost that respondent incurs for bags and bagging exceeds the increase in proceeds, known as the bagging premium, that respondent receives for selling cement in bags.[10]  Respondent still receives a profit on the cement it sells in bags, but less profit than if it had sold the cement in bulk.[11]

Because respondent considered its first marketable product to be cement sold in bulk rather than all cement sold, whether in bulk or in bags, respondent did not include proceeds from the sale of cement in bags in the total-proceeds figure of the proportionate profits method.  Nor did respondent include in the total-costs figure the costs it incurred for bags, bagging, storage, distribution, and sales.[12]  The result of this position was that the proportionate profits method yielded a greater constructive gross income from mining, and respondent reported a correspondingly greater depletion deduction, than would have been the case if respondent had included those proceeds and costs in its computation by the method.

After an audit, the Commissioner determined that respond-

---

[9] During the tax years in question, respondent sold approximately 92–94% of its finished cement in bulk.  Respondent sold the other 6–8% in bags.

[10] The parties stipulated in the Tax Court that respondent's bagging costs exceeded the bagging premium by $55,410.88 for tax year 1970, by $66,667.45 for tax year 1971, and by $64,590.41 for tax year 1972.

[11] The parties stipulated in the Tax Court "that although for each year there was an excess of costs over bag premium, . . . [respondent] nevertheless realized a net profit on the sale of each bag of cement."

[12] To state respondent's position in the formulaic terms used in Treas. Reg. § 1.613–4 (d) (4) (ii), 26 CFR § 1.613–4 (d) (4) (ii) (1980), respondent did not include proceeds from the sale of cement in bags in the multiplier of the proportionate profits method; and respondent did not include the costs of bags, bagging, storage, distribution, and sales in the denominator of the method's fraction.

ent's reported tax liabilities were deficient.[13]   The Commissioner took the position that respondent's first marketable product is cement, whether sold in bulk or in bags, that respondent therefore should have included proceeds from its sales of bagged cement in its total-proceeds figure, and also that respondent should have included in its total-costs figure the costs it incurred for bags, bagging, storage, distribution, and sales.   Respondent then filed this suit in the Tax Court for a redetermination.

The Tax Court, following its rule of applying the law of the court of appeals to which an appeal would be taken,[14] relied upon *United States* v. *Ideal Basic Industries, Inc.,* 404 F. 2d 122 (CA10 1968), cert. denied, 395 U. S. 936 (1969), and accepted respondent's position.   36 TCM 578 (1977), ¶ 77,137 P–H Memo TC.   *Ideal Basic Industries* had held that cement sold in bulk is the first marketable product of an integrated miner-manufacturer and that revenues from sales of cement in bags, and the costs of bags, bagging, storage, distribution, and sales, should not be included in calculations under the proportionate profits method.   404 F. 2d, at 125–126.   The Court of Appeals for the Tenth Circuit affirmed, also adhering to *Ideal Basic Industries.*   614 F. 2d 724 (1980) (*per curiam*).   It rejected the Commissioner's argument that Treasury Regulations dictate the opposite result.   We granted the Commissioner's petition for a writ of certiorari because other Courts of Appeals have accepted the Commissioner's position in cases with substantially identical facts.[15]   449 U. S. 818 (1980).   We now reverse.

---

[13] The asserted deficiencies were $44,200, $41,509, and $7,175 for tax years 1970, 1971, and 1972, respectively.   See 36 TCM, at 578, ¶ 77,137, p. 582, P–H Memo TC.

[14] See *Golsen* v. *Commissioner,* 54 T. C. 742 (1970), aff'd on other grounds, 445 F. 2d 985 (CA10), cert. denied, 404 U. S. 940 (1971).

[15] See *General Portland Cement Co.* v. *United States,* 628 F. 2d 321 (CA5 1980), cert. pending, No. 80–1211; *Arvonia-Buckingham Slate Co.* v. *United States,* 426 F. 2d 484 (CA4 1970); *United States* v. *California*

## II

Congress requires in § 611 that the allowance of the deple-tion deduction is "in all cases to be made under regulations prescribed by the Secretary." The Commissioner provided the proportionate profits method pursuant to this delegation of authority.[16] Also pursuant to this authority, the Commis-sioner has promulgated regulations which specifically address the questions before us. We find these regulations dispositive.

The Treasury Regulations define "first marketable prod-uct" as "the product (or group of essentially the same prod-ucts) produced by the taxpayer as a result of the application of nonmining processes, in the form or condition in which such product or products are first marketed in significant quantities by the taxpayer or by others in the taxpayer's mar-keting area." 26 CFR § 1.613–4 (d)(4)(iv) (1980). This definition continues:

> "For this purpose, bulk and packaged products are con-sidered to be essentially the same product. . . . The first marketable product or group of products does not include any product which results from additional manu-facturing or other nonmining processes applied to the product or products first marketed in significant quanti-

*Portland Cement Co.*, 413 F. 2d 161 (CA9 1969); *Whitehall Cement Manufacturing Co.* v. *United States*, 369 F. 2d 468 (CA3 1966).

[16] The Commissioner has prescribed the computation of gross income from mining by reference to proportionate profits in successive regula-tions since 1940. The principle now set forth in Treas. Reg. § 1.613–4 (d)(4) first appeared in Treas. Regs. 103, § 19.23 (m)–1 (f) (1940), and it continued in successive regulations to the 1939 Code. Treas. Regs. 111, § 29.23 (m)–1 (f) (1943); Treas. Regs. 118, § 39.23 (m)–(e)(3) (1953). Treasury Regulations 118 continued in force under the 1954 Code until superseded by Treas. Reg. §§ 1.613–3 (d)(1)(i), (ii). See T. D. 6965, 1968–2 Cum. Bull. 265. These regulations were superseded by the present Treas. Reg. §§ 1.613–4 (d)(1) and (4)(i), (ii), 26 CFR §§ 1.613–4 (d)(1) and (4)(i), (ii) (1980). See T. D. 7170, 1972–1 Cum. Bull. 178.

ties by the taxpayer or others in the taxpayer's marketing area. For example, if a cement manufacturer sells his own finished cement in bulk and bags and also sells concrete blocks or dry ready-mix aggregates containing additives, the finished cement, in bulk and bags, constitutes the first marketable product or group of products produced by him."

This regulation supports the Commissioner's position that cement sold in bulk is the same product as cement sold in bags, and that the container for the cement—whether a tank car supplied by the customer or a bag supplied by respondent—does not distinguish cement in bulk from cement in bags for the purpose of determining respondent's first marketable product. Federal Courts of Appeals other than the court below have relied on the regulation to uphold the Commissioner's position. *General Portland Cement Co.* v. *United States,* 628 F. 2d 321, 323 (CA5 1980), cert. pending, No. 80–1211; *United States* v. *California Portland Cement Co.,* 413 F. 2d 161 (CA9 1969). Indeed, the Commissioner's position also is supported by respondent's stipulation in the Tax Court that "[t]hat portion of its cement sold . . . in bags is the same material as the cement sold in bulk."

The Treasury Regulations also support the Commissioner's position that respondent must include in the total-costs figure of the method the costs of bags, bagging, storage, and distribution. To derive the portion of total proceeds that reflects the ratio between respondent's mining costs and its total costs, respondent must include in the total-costs figure "all the mining and nonmining costs paid or incurred to produce, sell, and transport the first marketable product." 26 CFR § 1.613–4 (d)(4)(ii) (1980). The exclusion of nonmining costs from the total-costs figure has the effect of including the proportionate profits earned by such costs within respondent's depletion base. Such inclusion enhances

respondent's depletion base by proceeds that were not earned
by respondent's mining operation, and accordingly respond-
ent's depletion deduction becomes a recoupment for more than
the exhaustion of respondent's mine. It is undisputed, how-
ever, that Congress allows the depletion deduction to permit
recoupment for the exhaustion of the mineral only. See
*United States* v. *Cannelton Sewer Pipe Co.,* 364 U. S., at 81,
85–86; *Commissioner* v. *Southwest Exploration Co.,* 350 U. S.
308, 312 (1956); *General Portland Cement Co.* v. *United
States, supra,* at 322. It also is undisputed that the Treasury
Regulations classify the costs of bags, bagging, storage, and
distribution as nonmining costs. 26 CFR § 1.613–4 (d)(3)
(iii) (1980).[17] Courts of Appeals have accepted the Com-
missioner's position on this question also. *General Portland
Cement Co.* v. *United States, supra,* at 326; *Southwestern
Portland Cement Co.* v. *United States,* 435 F. 2d 504, 508, 510

---

[17] Title 26 CFR § 1.613–4 (d)(3)(iii) (1980) provides in pertinent part:
"In determining gross income from mining by use of methods based on
the taxpayer's costs—

"(a) The costs attributable to containers, bags, packages, pallets, and
similar items as well as the costs of materials and labor attributable to
bagging, packaging, palletizing, or similar operations shall be considered
as nonmining costs.

.          .          .          .          .

"(c) The costs attributable to the operation of warehouses or distribu-
tion terminals for manufactured products shall be considered as nonmin-
ing costs.

"Accordingly, all profits attributable thereto are treated as nonmining
profits."

The court below did not dispute the regulations' characterization of these
costs. 614 F. 2d 724, 725 (1980). To the contrary, *United States* v. *Ideal
Basic Industries, Inc.,* 404 F. 2d 122 (CA10 1968), cert. denied, 395 U. S.
936 (1969), concluded before these regulations were promulgated that such
costs are nonmining costs. 404 F. 2d, at 125–126. But the court, follow-
ing *Ideal Basic Industries,* excluded these costs from the proportionate
profits method on the ground that they were not incurred in producing and
transporting cement sold in bulk. See 614 F. 2d, at 726.

(CA9 1970); *United States* v. *California Portland Cement Co., supra,* at 168–169; *Whitehall Cement Manufacturing Co.* v. *United States,* 369 F. 2d 468, 473–474 (CA3 1966).

Finally, the Treasury Regulations support the Commissioner's position that respondent must include as nonmining costs the costs incurred in selling the first marketable product. The regulations provide that integrated miner-manufacturers must treat sales expenses as nonmining costs absent evidence that unintegrated miners typically incur such expenses in selling their mineral product. §§ 1.613–4 (d)(3) (iv), 1.613–5 (c)(4)(ii).[18] These regulations simply recognize that sales of finished cement occur after the point at which an integrated miner-manufacturer's mining phase ends and its manufacturing phase begins. See 26 U. S. C. § 613 (c)(4)(F); cf. *General Portland Cement Co.* v. *United States, supra,* at 333. Integrated miner-manufacturers may allocate selling costs between their mining and manufacturing phases

---

[18] Title 26 CFR § 1.613–4 (d)(3)(iv) (1980) provides:

"In computing gross income from mining by the use of methods based on the taxpayer's costs, the principles set forth in paragraph (c) of § 1.613–5 shall apply when determining whether selling expenses . . . are to be treated, in whole or in part, as mining costs or as nonmining costs. To the extent that selling expenses . . . are treated as nonmining costs, all profits attributable thereto are treated as nonmining profits."

Title 26 CFR § 1.613–5 (c)(4)(ii) (1980) provides:

"A reasonable portion of the expenses of selling a refined, manufactured, or fabricated product shall be subtracted from gross income from the property. Such reasonable portion shall be equivalent to the typical selling expenses which are incurred by unintegrated miners or producers in the same mineral industry so as to maintain equality in the tax treatment of unintegrated miners or producers in comparison with integrated miner-manufacturers or producer-manufacturers. If unintegrated miners or producers in the same mineral industry do not typically incur any selling expenses, then no portion of the expenses of selling a refined, manufactured, or fabricated product shall be subtracted from gross income from the property when determining the taxpayer's taxable income from the property."

if they can show that unintegrated miners typically incur selling expenses, for that maintains a parity of tax treatment between integrated miner-manufacturers and unintegrated miners. But respondent has not put forth such evidence in this case, there being no unintegrated miners in the cement industry.

These regulations command our respect, for Congress has delegated to the Secretary of the Treasury, not to this Court, the task "of administering the tax laws of the Nation." *United States* v. *Cartwright*, 411 U. S. 546, 550 (1973); accord, *United States* v. *Correll*, 389 U. S. 299, 307 (1967); see 26 U. S. C. § 7805 (a). We therefore must defer to Treasury Regulations that "implement the congressional mandate in some reasonable manner." *United States* v. *Correll, supra*, at 307; accord, *National Muffler Dealers Assn.* v. *United States*, 440 U. S. 472, 476–477 (1979). To put the same principle conversely, Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner* v. *South Texas Lumber Co.*, 333 U. S. 496, 501 (1948); accord, *Fulman* v. *United States*, 434 U. S. 528, 533 (1978); *Bingler* v. *Johnson*, 394 U. S. 741, 749–751 (1969). Indeed, our customary deference to Treasury Regulations is particularly appropriate in this case, for the Court previously has recognized the necessity of a "broad rule-making delegation" of authority in the area of depletion: "As Congress obviously could not foresee the multifarious circumstances which would involve questions of depletion, it delegated to the Commissioner the duty of making the regulations." *Douglas* v. *Commissioner*, 322 U. S. 275, 280, 281 (1944); [19] accord, *Helvering* v. *Wilshire Oil Co., Inc.*, 308 U. S. 90, 102–103 (1939).

---

[19] *Douglas* v. *Commissioner* involved § 23, Revenue Act of 1936, which was identical to the present § 611 in all ways significant to this case. See 322 U. S., at 278.

## III

Respondent does not contend that these Treasury Regulations are either unreasonable on their face or inconsistent with the Code. To the contrary, respondent acknowledges that several courts have found the regulations to prescribe a reasonable formula for determining gross income from mining in cases where no actual income is realized and no representative market price is available. Respondent's contention is that the Commissioner's position will yield a distorted constructive gross income from mining if it is applied without regard to the particular circumstances in this case.

### A

Respondent's position rests upon (i) an assumption about gross income from mining and (ii) an interpretation of this Court's decision in *United States* v. *Cannelton Sewer Pipe Co.,* 364 U. S. 76 (1960). Respondent deems "gross income from mining," for the purpose of the percentage depletion deduction, to be the same thing as "the market value of the extracted minerals" at the end of the mining phase, Brief for Respondent 14; and respondent reads *Cannelton* to hold that, for the purpose of determining gross income from mining, the mining phase of an integrated mining-manufacturing operation should be considered one independent business selling its product to another independent business, the manufacturing phase. On the basis of these notions, respondent perceives a potential for distortion of constructive gross income inhering in the premise of the proportionate profits method. The premise of that method is that each dollar of costs, mining and nonmining alike, earns the same proportionate part of the proceeds from the first marketable product. In respondent's view, however, it simply will not be true in some cases that each dollar of costs earns the same share of proceeds. For example, respondent contends, market forces and arm's-length negotiations may so affect market value when an in-

dependent miner sells to an independent manufacturer that it will not be true that each dollar of cost earns the same share of proceeds; and respondent contends that it certainly is not true in this case that each of its dollars of cost earned the same share of proceeds, for the cost of bags and bagging exceeds the bagging premium.

Respondent does not conclude from this reasoning that the proportionate profits method is unreasonable in itself. Rather, it argues that the method will distort constructive gross income from mining to the extent that the particular facts of a case deviate from the method's premise, and that the possibility of distortion increases as costs and proceeds attending postmining processes are included. To remedy this, respondent asks that the Commissioner take into account the "peculiar" circumstance that respondent's bagging costs exceed its bagging premium.[20] If this were done, respondent says, the distortion that it perceives could be obviated by considering its first marketable product to be only cement sold in bulk, not cement sold both in bulk and in bags. If only bulk sales are considered to be the first marketable product, then the proceeds from cement sold in bags, and the costs of bags, bagging, storage, and distribution, will

---

[20] In support of its argument, respondent relies in part upon the language of § 611 (a), which provides that the depletion deduction is to be allowed "according to the peculiar conditions in each case." Respondent has read this phrase out of context. In fuller reading, § 611 (a) provides:

*"In the case* of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions *in each case;* such reasonable allowance *in all cases* to be made under regulations prescribed by the Secretary. . . ." (Emphasis added.)

Read in context, "in each case" refers to the different types of depletable resource, not to individual taxpayers. Accordingly, this language does not support respondent's argument that the Treasury Regulations providing the proportionate profits method must be modified with regard to the circumstances in each case.

be excluded from the proportionate profits method. This was essentially the reasoning and holding of *Ideal Basic Industries*, 404 F. 2d, at 125–127.

We cannot accept respondent's contention, for it misperceives both the meaning of "gross income from mining" and the holding in *Cannelton*. Respondent cites nothing to support the assumption that gross income from mining means market value of the mining product. The language of §§ 613 (a) and (c) does not support this assumption; and *Helvering* v. *Mountain Producers Corp.*, 303 U. S. 376, 381–382 (1938), rejected it.[21] See also *Commissioner* v. *Southwest Exploration Co.*, 350 U. S., at 312. Under the Code and regulations, gross income from mining means income received, whether actually or constructively, without regard to value. Nor does *Cannelton* support respondent's argument. That case did not involve the proportionate profits method of determining constructive gross income from mining. The question there, under an earlier statutory definition of "mining," was when the mining phase ended in the operation of an integrated miner-manufacturer of burnt clay products. See 364 U. S., at 84, and n. 8. In interpreting the definition of "mining," the Court observed that "the Congress intended integrated

---

[21] *Helvering* v. *Mountain Producers Corp.* involved a depletion deduction in the case of oil and gas wells. By contract, the owner of oil-field leases agreed to sell oil to an oil refiner at a set price. In return, the refiner agreed, as part of the price of the oil, to conduct all operations to develop and produce the oil. The owner then claimed that its "gross income from the property," for the purpose of percentage depletion deduction, consisted of the total cash payments received from the refiner, plus the cost of production defrayed by the refiner under the contract. 303 U. S., at 378–379. The Court rejected this claim. It held that the deductible percentage of gross income "is a fixed factor, not to be increased or lessened by asserted equities," such as the fact that "gross income from time to time may be more or less than market value according to the bearing of particular contracts." *Id.*, at 382. The Court added: "With the motives which lead the taxpayer to be satisfied with the proceeds he receives we are not concerned." *Ibid.*

mining-manufacturing operations to be treated as if the operator were selling the mineral mined to himself for fabrication." *Id.,* at 89. This statement, in the context in which it occurs, does not support respondent's contention that the method used to determine constructive gross income must take into account forces that might cause income to differ from value.

Nor does the difference between bagging costs and the bagging premium warrant a deviation from the Treasury Regulation's definition of "first marketable product." Respondent receives a net profit on every bag of cement that it sells, despite the fact that bagging costs exceed markup on the product. It is reasonable to infer, therefore, that the costs of bagging the cement contribute to respondent's profits from sales of cement in bags. Courts of Appeals other than the court below have found this inference reasonable. *General Portland Cement Co.* v. *United States,* 628 F. 2d, at 330–331; *Whitehall Cement Manufacturing Co.* v. *United States,* 369 F. 2d, at 474; see also *United States* v. *California Portland Cement,* 413 F. 2d, at 169.

B

There remains only respondent's contention that the costs it incurred in the storage, distribution, and sales of its first marketable product, if they must be included in the proportionate profits method, should be treated as indirect costs which benefit the entire mining-manufacturing operation. For that reason, respondent urges that these costs should be allocated between mining and manufacturing.

The statutory definition of "mining" forecloses this contention. Section 613 (c)(4)(F) of the Code defines "mining" to include all processes up to the introduction of the kiln feed into the kiln, "but not . . . any subsequent process." The regulations recognize that storage, distribution, and sales are "subsequent process[es]," and we find the regulations reasonable. 26 CFR § 1.613–4 (d)(3)(iii) (1980) (storage and

distribution); §§ 1.613–4 (d)(3)(iv) and 1.613–5 (c)(4)(ii) (sales). These regulations allow a different treatment only for sales expenses. See *supra,* at 168–169. Respondent, who bore the burden of proof in the Tax Court, made no showing to warrant treating sales expenses as anything but nonmining costs.[22]

## IV

In sum, the Treasury Regulations defining first marketable product, and those prescribing the treatment of the costs of bags, bagging, storage, distribution, and sales, dictate the result in this case. To be sure, the proportionate profits method can only approximate gross income from mining. The Commissioner does not contend that the method does more than approximate. But an approximation must suffice absent an actual gross income from mining, and respondent concedes that the proportionate profits method is a reasonable means of approximating. The method also is a means that respondent accepted, as it did not seek the Commissioner's approval of any other method.[23] Accordingly, respondent must apply the method as prescribed by the Commissioner.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[22] Respondent relies upon decisions which hold that an integrated miner-manufacturer may allocate sales expenses between mining and nonmining costs. *E. g., United States* v. *California Portland Cement Co.,* 413 F. 2d, at 170–172. These cases were decided before the issuance in 1972 of Treas. Regs. §§ 1.613–4 (d)(3)(iv) and 1.613–5 (c)(4)(ii). Prior to 1972, no regulations answered the question whether selling expenses were nonmining costs or allocable between mining and nonmining costs. The 1972 regulations assume, on the basis of the statutory definition of "mining," that they are nonmining costs. Nonetheless, the integrated miner-manufacturer may show otherwise,

[23] See *supra,* at 161, and n. 6.