**ZEMURRAY FOUNDATION,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

No. 81–3264.

United States Court of Appeals,
Fifth Circuit.

Sept. 27, 1982.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Dept. of Justice, Michael L. Paup, Chief, Appellate Section, Ann Belanger Durney, Terry L. Fredericks, Washington, D. C., for defendant-appellant.

Thomas B. Lemann, New Orleans, La., for plaintiff-appellee.

Before GEE and JOHNSON, Circuit Judges, and VAN PELT *, District Judge.

JOHNSON, Circuit Judge:

This is a civil action for recovery of excise taxes assessed and collected by the Internal Revenue Service (IRS) from the Zemurray Foundation (Foundation) for calendar year 1974. On March 31, 1978, the IRS assessed an excise tax deficiency of $112,317 plus interest against the Foundation for sale of an undivided one-half interest in timberland. The district court, 509 F.Supp. 976, however, determined that the sale of the timberland did not fall under the excise tax provisions of 26 U.S.C. § 4940, and entered judgment in favor of the Foundation. The Government appeals.

## I.  Background

The Foundation is a tax exempt private foundation subject to an excise tax on its net investment income under 26 U.S.C. § 4940, Internal Revenue Code, enacted as part of the Tax Reform Act of 1969 (Reform Act) (Pub.L. 91–172, 83 Stat. 487). On November 30, 1961, Samuel Zemurray died, bequeathing the Foundation naked ownership of an undivided one-half interest in 12,746 acres of timberland in Tangipahoa Parish, Louisiana. His wife, Sarah Zemurray, received a usufruct interest for life in the Foundation's undivided one-half interest.[1] The Foundation received possession of its interest by a judgment of possession on June 16, 1970.

---

* District Judge of the District of Nebraska, sitting by designation.

1. A "naked ownership" is an imperfect ownership subject to a usufruct. LSA–C.C. Art. 490 (West 1973). Usufruct is the right of enjoying a thing, the property of which is vested in another, and to draw from the same all the profit, utility, and advantages which it may produce, provided it be without altering the substance of the thing. LSA–C.C. Art. 533 (West 1973).

The timberland surrounded a private lodge and 100 to 150 acres of flower gardens. The flower gardens and parts of the timberland were open to the public for sightseeing, fishing, and hunting. The timberland was carefully managed to harvest timber on a sustained-yield basis, although actual income from timber sales fluctuated from year to year.[2] All of the income from these timber sales went to Mrs. Zemurray as usufructuary.

On February 16, 1974, Mrs. Zemurray donated her usufruct interest in the timberland to the Foundation. She was ninety-one years old at the time. Five days later, on February 21, 1974, the Foundation agreed to sell its entire one-half interest in the timberland to an unrelated third party, and the sale was consummated in June of that year. The Foundation did not receive any income from timber sales between February 16, 1974 and the date of the sale to the unrelated third party.

The value of the one-half interest in the timberland, including the usufruct, was $2,716,540 as of December 31, 1969.[3] The Foundation received $5,525,000 for this one-half interest in June of 1974. On March 31, 1978, the Commissioner of the IRS assessed a tax deficiency against the Zemurray Foundation of $112,317 plus interest of $23,797.62. The Commissioner contended that net capital gain on the sale of the timberland was "net investment income" subject to a four percent excise tax under 26 U.S.C. § 4940 and Treas.Reg. § 53.4940–1(f)(1) promulgated thereunder. The Foundation paid the asserted deficiency, interest, and penalty and then filed a claim for refund. When this claim was neither approved nor disallowed, the Foundation brought the instant action in the federal district court on March 23, 1979.

After a bench trial, the district court awarded the Foundation a refund of the excise tax plus statutory interest on grounds the Foundation never actually used the timberland to produce net investment income. In arriving at this result, the district court held that Treas.Reg. § 53.4940–1(f)(1) was invalidly overbroad in allowing taxation of property merely susceptible to use for production of net investment income, whether or not it was actually used for that purpose. The district court never actually determined whether timberland qualified as a type of property from which investment income could be produced. On appeal, the Government contends that Treas.Reg. § 53.4940–1(f)(1) validly applies to the taxation of capital gains from the sale of the timberland and that the gains are taxable.

II. *Taxability of Property for Purposes Set Forth In 26 U.S.C. § 4940*

At the time of the timberland sale, 26 U.S.C. § 4940(c)(4)(A) imposed an excise tax of four percent on the "net investment income" of charitable foundations.[4] 26 U.S.C. § 4940(c)(1) defines two types of net investment income: (1) "gross investment income" and (2) "net capital gain." Gross investment income is ordinary income from "interest, dividends, rents, and royalties." 26 U.S.C. § 4940(c)(2). Net capital gain includes "gains and losses from the sale or other disposition of property *used* for the production of interest, dividends, rents, and royalties," and certain other property involved in the tax of unrelated business in-

---

2. Actual income from timber sales between 1969 and 1974 was as follows:

| | |
|---|---|
| 1969 | $ 44,475.10 |
| 1970 | 15,771.42 |
| 1971 | 149,584.44 |
| 1972 | 120,677.61 |
| 1973 | 227,911.88 |
| 1974 | 19,077.08 |

3. The basis for determining gain in the case of property held by a private foundation subject to an excise tax under 26 U.S.C. § 4940 is the fair market value of the property on December 31, 1969, if the property was held on that date and continuously thereafter. 26 U.S.C. § 4940(c)(4)(B).

4. Section 4940, as originally enacted in 1969, levied a 4% excise tax on net investment income. A 1978 amendment changed the tax

come. 26 U.S.C. § 4940(c)(4) (emphasis added).[5]

At issue in the instant case is whether the timberland sold by the Foundation is taxable as "net capital gain." Treas.Reg. § 53.4940–1(f)(1), T.D. 7250, 1973–1 C.B. 469, 472, interprets net capital gain as follows:

> (f) *Capital gain and losses* —(1) *General rule.* In determining capital gain net income (net capital gain for taxable years beginning before January 1, 1977) for purposes of the tax imposed by section 4940, there shall be taken into account only capital gains and losses from the sale or other disposition of property held by a private foundation for investment purposes (other than program-related investments, as defined in section 4944(c)), and property used for the production of income included in computing the tax imposed by section 511 except to the extent gain or loss from the sale or other disposition of such property is taken into account for purposes of such tax. For taxable years beginning after December 31, 1972, property shall be treated as held for investment purposes even though such property is disposed of by the foundation immediately upon its receipt, if it is property of a type which generally produces interest, dividends, rents, royalties, or capital gains through appreciation (for example, rental real estate, stock, bonds, mineral interests, mortgages, and securities).

The regulation excludes gains and losses from the sale or other disposition of property used for the exempt (*i.e.,* charitable) purposes of the private foundation.[6]

The Foundation had only a naked ownership interest in the timberland for several years, during all of which time the income from the timberland went to the usufructuary, Mrs. Zemurray; the Foundation received no income from the timberland production prior to the sale; the Foundation sold no timber and received no income from the timberland after Mrs. Zemurray donated her usufruct interest. The Government nevertheless contends, in accordance with 26 U.S.C. § 4940 and Treas.Reg. § 53.4940–1(f)(1), that the Foundation's timberland was of a type "which generally produces" the applicable types of investment income. The language "generally produces" in the regulation interprets the term "used" in 26 U.S.C. § 4940(c)(4) to allow taxation so long as the property sold is *usable* to produce the applicable types of income, regardless of whether the property is actually used to produce income or not. The district court, however, determined that Treas.Reg. § 53.-4940–1(f)(1) invalidly broadened the term "used" to the extent that the regulation taxed property not *actually* used to produce taxable investment income, and held that the excise tax did not therefore apply to the Foundation's sale of the timberland.

■ This Court must determine whether the district court properly held Treas. Reg. § 53.4940–1(f)(1) invalid with respect to its interpretation of "used" in 26 U.S.C. § 4940(c)(4). A Treasury regulation is presumed to be valid unless it can be demonstrated that the regulation is unreasonable and plainly inconsistent with the statute. *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). *See also Beal Foundation v. United States*, 559 F.2d 359, 361 (5th Cir. 1977). The Treasury regula-

---

rate to 2%. *See* Revenue Act of 1978, Pub.L. 95–600, § 520(a), 92 Stat. 2763.

**5.** 26 U.S.C. § 4940(c)(4), recites, in pertinent part:

> **(4) Capital gains and losses.**—For purposes of paragraph (1) in determining capital gain net income—
> (A) There shall be taken into account only gains and losses from the sale or other disposition of property used for the produc-

tion of interest, dividends, rents, and royalties, and property used for the production of income included in computing the tax imposed by section 511 (except to the extent gain or loss from the sale or other disposition of such property is taken into account for purposes of such tax).

**6.** This regulation was adopted on January 5, 1973.

tion's interpretation in the instant case is not perceived as unreasonable or plainly inconsistent with the statute. The language of the statute is susceptible to at least two reasonable interpretations of the term "used": the IRS interpretation and the Foundation's interpretation.[7] Furthermore, several canons of statutory construction give support to the IRS interpretation. First, the administrative regulation was a substantially contemporaneous interpretation of 26 U.S.C. § 4940(c)(4) and therefore entitled to even greater weight than is otherwise accorded to a regulation. *See National Muffler Dealers Association v. United States*, 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979); *White v. Winchester Club*, 315 U.S. 32, 41, 62 S.Ct. 425, 430, 86 L.Ed. 619 (1942). Second, congressional reaction appears to support the administrative interpretation. Since the regulation's adoption, Congress has amended 26 U.S.C. § 4940 on three separate occasions—each time without materially changing the provisions of section 4940(c)(4)(A).[8] Congressional approval is reflected by virtue of subsequent re-enactments without material changes. *See Helvering v. Winmill*, 305 U.S. 79, 82–3, 59 S.Ct. 45, 46–47, 83 L.Ed. 52 (1938); *Provost v. United States*, 269 U.S. 443, 457–8, 46 S.Ct. 152, 155–56, 70 L.Ed. 352 (1926); *Komada & Co. v. United States*, 215 U.S. 392, 396–8, 30 S.Ct. 136, 137–38, 54 L.Ed. 249 (1910).

The Government's interpretation is also supported by the broad congressional purpose underlying 26 U.S.C. § 4940. The Reform Act was passed to ensure that private foundations promptly and properly use their funds for charitable purposes. H.R. Rep.No.91–413, Pt. 1, 91st Cong., 1st Sess. 1, 19 (1969). *Accord* S.Rep.No.91–552, 91st Cong., 1st Sess. 1, 25–27 (1969), U.S.Code Cong. & Admin.News 1969, p. 1645. Congress created the excise tax in 26 U.S.C. § 4940 as an audit fee to be paid by foundations to finance government supervision of a foundation's investment income activity. The intent of both the Reform Act in general and the excise tax in particular was to prevent abuse resulting from the tax exempt status of charitable foundations.[9]

---

**7.** The Tax Court in *Friedman Foundation, Inc. v. Commissioner*, 71 T.C. 40, 50 (1978) observed that the term "use" in § 4940(c)(4) is capable of several constructions:

> For example, we might conclude that the term "use" referred to is use of the property by the foundation.... On the other hand, we might conclude that use by either the foundation or its donors is sufficient for taxation under Section 4940. Alternatively, relying on part 2 of the Ways and Means Committee Report, we might conclude that a holding for investment income consisting of capital gain is sufficient for taxation under section 4940 (here, too, we might conclude that the relevant holding must be that of the foundation alone or that the relevant holding may be that of either the foundation or donor). As another possibility, we might conclude that the pattern of statutory materials requires the line be drawn between the foundation's "charitable assets" and its "noncharitable assets." Other alternatives may suggest themselves after careful perusal of the statute and its legislative history.

The court in *Friedman* ultimately determined that sale of stock by a foundation immediately upon receipt was taxable, even though the stock produced no income stream from dividends before the sale.

**8.** Since 1974, § 4940 has been amended on three occasions. Section 1901(b)(33)(N) of the Tax Reform Act of 1976, Pub.L.No.94–455, 90 Stat. 1520, substituted the phrase "capital gains net income" for the phrase "net capital gain" found in § 4940(c)(1) and (c)(4). Effective for amounts received after December 31, 1976, the definition of "gross investment income" found in § 4940(c)(2) was amended to include payments received from securities loans by § 2(a)(4) of the Act of August 15, 1978, Pub.L.No.95–345, 92 Stat. 481. Finally, for taxable years beginning after September 30, 1977, the excise tax was reduced from 4% to 2% by the Revenue Act of 1978, Pub.L.No.95–600, § 520(a), 92 Stat. 2763. Because the transaction which is in question here occurred in 1974, none of these amendments are applicable to this case.

**9.** The broad purpose in enacting § 4940 is set forth in H.R.Rep.No.91–413, Pt. 1, 91st Cong., 1st Sess. at 19 (1969), U.S.Code Cong. & Admin.News 1969, at 1663:

> Your Committee believes that since the benefits of government are available to all, the costs should be borne, at least to some extent, by all of those able to pay. Your committee believes that this is as true for private foundations as it is for taxpayers generally. Also, it is clear that vigorous and extensive administration is needed in order to provide appropriate assurances that private founda-

Any ambiguity or susceptibility of the language of the statute to more than one interpretation, therefore, should be broadly interpreted.

Accordingly, the district court erred in holding Treas.Reg. § 53.4940–1(f)(1) invalid with respect to its interpretation of "used" in 26 U.S.C. § 4940(c)(4).

### III. *Taxability of Property Held for "Capital Gains Through Appreciation"*

■ The question remains whether the Foundation's timberland is the type of property subject to the excise tax. Treas. Reg. § 53.4940–1(f)(1) is made applicable to gains on property used for interest, dividends, rents, and royalties. Treas.Reg. § 53.4940–1(f)(1) expands upon the four categories (interest, dividends, rents, and royalties) of taxable property by adding a fifth category effective December 31, 1972:

> ... if it is property of a type which generally produces interest, dividends, rents, royalties, or *capital gains through appreciation* (for example, rental real estate, stock, bonds, mineral interests, mortgages, and securities.)

(emphasis added). The district court made no finding of fact as to whether the Foundation's timberland was property which generally produces interest, dividends, rents, or royalties. Rather, the district court determined that it was not necessary to decide this issue, since the Foundation had failed to actually use the land for production of income before the sale.

■ Under these circumstances, this cause must be remanded to the district court for findings of fact on whether the timberland was property which generally produces interest, dividends, rents, or royalties.[10] The district court, however, has complicated this course of action by finding that the timberland is the "type of property that generally produces capital gains

through appreciation." The district court further held that Treas.Reg. § 53.4940–1(f)(1) is invalid to the extent it subjects to the excise tax any property which generally produces "capital gains through appreciation." We again hold that the district court erred.

■ Read in isolation, 26 U.S.C. § 4940(c)(4) might appear to extend only to property used for the production of "interest, dividends, rents, and royalties." Statutory meaning, however, is to be derived not from reading of a single sentence or section, but from the provisions of the whole law, and its object and policy. *Philbrook v. Glodgett*, 421 U.S. 707, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975); *Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974).

A narrow reading of the phrase "... if it is property of a type which generally produces interest, dividends, rents, royalties, or capital gains through appreciation (for example, rental real estate, stock, bonds, mineral interests, mortgages, and securities)" appears to underscore the interpretation previously made by this Court of the word "used." The regulation simply recognizes that property usable for interest, dividends, rents, or royalties may sometimes be held simply for capital gains through appreciation. Growth stocks would be a prime example, *see Friedman Foundation, supra*, and the regulation lists several others. Interpreted in this manner, this phrase in the regulation is neither unreasonable nor inconsistent with 26 U.S.C. § 4940(c)(4), and, therefore, must be presumed valid. *Portland Cement, supra*.

On remand, the district court should make a factual determination on whether the timberland is the type of property which generally produces interest, divi-

---

tions will promptly and properly use their funds for charitable purposes. This tax, then, may be viewed as being in part a user fee.

**10.** Although the Government contends that, as a matter of law, the property was of a type that

generally produces rents or royalties, it recognizes in its brief that any such factual determination should be made at the trial level. *Balso Foundation v. United States*, 46 A.F.T.R.2d (P–H) ¶ 80–5121 (D.C.Conn. May 27, 1980).

dends, rents, or royalties.[11] Even if the timberland is property held for capital gains through appreciation, the district court should treat it as property used for interest, dividends, rents, or royalties if the property is susceptible for use in this manner.[12]

The judgment of the district court is reversed and this cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

GEE, Circuit Judge, dissenting:

The law applicable to this sale by a charity of a capital asset provides, in pertinent part, that a tax is due upon the gain from such a sale of "property used for the production of interest, dividends, rents, and royalties...." 26 U.S.C. § 4940(c)(4)(A). Since it is undisputed that this charity did not *use* the property concerned for any such production, the late Judge Gordon held that no tax was due. *Zemurray Foundation v. United States*, 509 F.Supp. 976 (E.D.La. 1981). We hold that because the property may have been *usable* for such purposes its sale may be taxable and remand for such a determination. With deference, and for the reasons stated in his opinion, it seems to me that Judge Gordon has the better of the argument.[1]

There is nothing ambiguous about the word "used," and it simply does not mean "usable."[2] Had Congress meant the latter, it could easily have said so. Though it did not, Treasury decrees that this is what it meant, and we agree. I see no more justification for this than for a decision by us that had Congress instead said "usable," it really meant "used." Why is one amendment preferable to the other?

More than most others, tax laws are literally received and applied. A reason for this is that tax impositions and exemptions are matters of legislative grace and of compromises—compromises typically ending hard

**11.** The Government in its briefs has listed several theories under which the timberland would qualify as property usable for rents or royalties. The district court may also wish to consider the possible uses of undeveloped land set forth in *Balso, supra.*

**12.** The Government broadly interprets the phrase "capital gains through appreciation" to include all noncharitable assets sold by a charitable foundation. It is not necessary to rule on the validity of this broader interpretation at this time, since the district court has not made a finding on the applicability of the more limited categories set forth in the statute.

**1.** The regulation upon which the majority travels also adds to the law's listing of assets used to produce "interest, dividends, rents and royalties" a fifth category: "property of a type which generally produces ... capital gains through appreciation." Treas.Reg. § 53.4940–1(f)(1). Judge Gordon specifically found that the property in question was of the type added by this fifth category but held this an invalid expansion of the law's reach. The majority holds that he erred in so ruling (MS p. 9) but declines to uphold the imposition of tax on that basis. I confess that I do not understand this action.

If Judge Gordon erred and the added category is valid, it seems to me that the majority should reverse and uphold the imposition of the tax, obviating the need for a remand. Judge Gordon's factual finding that this timberland is included in the fifth category is reviewable by us under the "clearly erroneous" standard of Fed.R.Civ.P. 52. As the Supreme Court recently held, "clearly erroneous" means precisely that, *see Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), and the majority fails to demonstrate that the trial court's finding meets this standard.

I do not think the category valid, however, since it adds to the list a type of property that the law plainly omits. As an example, assume the charity was given a jade figurine or an ornate silver chalice. These do not generally produce "interest, dividends, rents [or] royalties." Thus the law as enacted by Congress would not tax their sale. They do, however, appreciate—and so the regulation would cover and tax their disposition. For similar reasons to those that I state in text below, I think such an inclusion of new and entirely different categories of property—an inclusion that converts a limited list of types of assets to an all-inclusive one that could more simply be phrased as "all capital assets"—is not regulation but rather legislation.

**2.** A possible construction might be that if the asset has ever been so "used" by the charity's benefactor (or any predecessor), the imposition of a tax was intended. I am unable to conceive of any policy affecting the charity that could underlie such an approach, however, or any rhyme or reason informing it. I therefore hesitate to impute it to Congress.

fights between advocates of opposing forces and policies. To a considerable extent they simply represent where the contending forces exhausted themselves and the legislative struggle came to an end. To reopen the contest in the judicial branch, in the name of an internal consistency that seems satisfying to us, and declare a different outcome seems to me an action beyond the warrant of our office and especially inappropriate in the tax field. I respectfully dissent.