**GREENACRE FOUNDATION,**
Appellant,

v.

**The UNITED STATES, Appellee.**

Appeal No. 85–741.

United States Court of Appeals,
Federal Circuit.

May 16, 1985.

Leonard Silverstein, Silverstein & Mullens, Washington, D.C., argued, for appellant. With him on brief was Deborah M. Beers.

Ann B. Durney, Tax Div., Dept. of Justice, Washington, D.C., argued, for appellee. With her on brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Patricia M. Bowman.

Before RICH and DAVIS, Circuit Judges, and COWEN, Senior Circuit Judge.

DAVIS, Circuit Judge.

The question is whether a tax-exempt private foundation is liable (under the special tax imposed by 26 U.S.C. § 4940) with respect to capital gains from sales of stocks donated to the foundation and shortly sold pursuant to pre-existing plan. In this refund suit, the Claims Court (Kozinski, *C.J.*) somewhat reluctantly held that such gains were to be included in the tax. 6 Cl.Ct. 113 (1984). On taxpayer's appeal, we affirm on the ground that the pertinent

Treasury Department regulations validly so provide.

## I.

Appellant-taxpayer Greenacre Foundation (Greenacre) is a non-profit New York corporation and is tax-exempt as a private operating foundation under the Internal Revenue Code.[1] During 1973–75, Greenacre received, by donation, a number of shares of stock which were very shortly thereafter sold (in 1974, 1975, and 1976) with realization of capital gains. Greenacre did not include that gain in computing the tax on private foundations levied by 26 U.S.C. § 4940(a). The Internal Revenue Service (IRS), of the view that these gains should have been included, imposed deficiencies which taxpayers paid. Greenacre filed refund claims which were denied; it then timely filed this refund suit in the Claims Court.

The parties stipulated the following facts: The securities now involved (entirely stock shares) were never used or intended for use by Greenacre for the production of interest, dividends, rents, or royalties, and no interest, dividends, rents, or royalties were received by Greenacre on those securities during the period it held them. Greenacre intended to sell those securities immediately on receipt in order to fund its operations and endowment. However, the securities are property of the type which generally produces interest, dividends, royalties, or capital gains through appreciation; the companies that issued these securities were publicly traded and all except one security admittedly paid dividends at one time or another in the years 1972–1976. Greenacre's sale of the stocks came within a few days after receipt, the longest holding period being 30 days.

On cross-motions (based on these stipulated facts) the Claims Court held for the

Government, granting its motion and denying taxpayer's. Though expressing doubts as to the proper interpretation of the statute, the court accepted the position taken in the Treasury Regulation and by the prior judicial decisions on the point. This appeal followed.

## II.

Section 4940(a) of the Internal Revenue Code, 26 U.S.C. § 4940(a) imposed (for the taxable years involved [2]) a 4% excise tax on "the net investment income" of tax-exempt private foundations.[3] Section 4940(c) defines "net investment income" as including "gross investment income" plus "net capital gains" less allowable deductions. In turn, the statute provides (§ 4940(c)(4)(A)) that in determining "net capital gains":

There shall be taken into account only gains and losses from the sale or other disposition of *property used for the production of interest, dividends, rents, and royalties,* and property used for the production of income included in computing the tax imposed by section 511 [the unrelated business income tax] (except to the extent gain or loss from the sale or other disposition of such property is taken into account for purposes of such tax). [Emphasis added.]

Treasury Regulations § 53.4940–1(f)(1), implementing the tax statute, provide, *inter alia:*

For taxable years beginning after December 31, 1972, *property shall be treated as held for investment purposes even though such property is disposed of by the foundation immediately upon its receipt, if it is property of a type which generally produces interest, dividends, rents, royalties,* or capital gains through appreciation (for example, rental real estate, stocks, bonds, mineral interests, mortgages, and securities). Under this

---

1. Greenacre operates a public "pocket" park in the City of New York.

2. These are 1974, 1975, and 1976. For taxable years beginning after September 30, 1977, the rate was reduced to 2%. Pub.L. No. 95–600, § 520(a), 92 Stat. 2763, 2884 (1978).

3. This tax originated in the Tax Reform Act of 1969, Pub.L. No. 91–172, § 101(b), 83 Stat. 487, 498 (1969).

subparagraph, gains and losses from the sale or other disposition of property used for the exempt purposes of the private foundation are excluded.... [Emphasis added.]

The stipulated facts, Part I, *supra,* show that the stock in issue here falls within the emphasized portion of Treas.Reg. § 53.-4940–1(f)(1), *supra,* though those securities did not actually produce dividends during the short period they were held by Greenacre and though the stocks were not held for that purpose. The issue, therefore, is whether this part of the regulation is a valid implementation of the taxing statute, § 4940(c)(4)(A), *supra.* That is the question decided by the Claims Court and argued to us by both sides.

### III.

Because decision of this case turns on the validity of part of a Treasury Regulation, promulgated in 1973 under § 7805(a) of the Internal Revenue Code, we must start with the established principle that such Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981); *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed.2d 831 (1948). *See,* also, *Bob Jones University v. United States,* 461 U.S. 574, 596–97, 103 S.Ct. 2017, 2031, 76 L.Ed.2d 157 (1983); *Bingler v. Johnson,* 394 U.S. 741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969); *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967).[4]

Appellant's position is that the portion of the regulation before us is inconsistent with the taxing statute, § 4940 *supra,* which provides that the tax can take into account "only" gains from the sale of property "used" for the production of dividends, etc.—and that the stock involved here was not so "used" during the time it was held by Greenacre since no dividends were received and the stock was not held for investment. Appellant's construction of the legislation is certainly not unreasonable but the problem for us is whether the *Treasury's* different interpretation, not taxpayer's, is unreasonable or plainly inconsistent with the congressional language and purpose.

As the Tax Court pointed out in *Friedman Foundation, Inc. v. Commissioner,* 71 T.C. 40, 50–51 (1978)—the first decision to consider and uphold this aspect of the regulation—the statutory word "used" is ambiguous and the legislative history is inconclusive as to its precise meaning.[5] Property "used" to produce interest, dividends, rents, or royalties can be read as property actually producing that type of income for the foundation. On the other hand, "used" in this context can be interpreted as the type of property that normally or generally produces that sort of income—"usable," "usually used," "regularly used."[6] Both readings fit well with the literal words of the statute, though it may be that each creates some problems. In this particular case Greenacre received no dividends and therefore the stock was not actually "used" to produce income. What if one dividend happened to be received during that short period? We agree with the *Friedman* opinion, 71 T.C. at 50, that it would be an "eccentric result," unlikely to be adopted by Congress, to include that particular stock in the tax base simply because of the fortuity of the receipt of a

---

**4.** In addition, the regulation (finally adopted in January 1973) is entitled to particular force "as a substantially contemporaneous construction of the [1969] statute by those presumed to have been aware of congressional intent." *National Muffler Dealers Assn. v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979).

**5.** To the same effect is *Zemurray Foundation v. United States,* 687 F.2d 97, 101 (5th Cir.1982), another decision sustaining the regulation. *Balso Foundation v. United States,* 573 F.Supp. 191 (D.Conn.1983), agrees with *Friedman* and *Zemurray.*

**6.** *Friedman, supra,* suggests other possibilities, including actual "use" by the donor (instead of the foundation).

dividend during the time the foundation held it. Present taxpayer does not grasp that nettle but says that the test is always whether the particular property was held for investment. The difficulty with that interpretation (as the compelled one) is that it departs from the precise words employed in § 4940(c)(4)(A), *supra* (which do not here refer to holding for investment), and moreover requires a separate, factual inquiry in each instance as to whether that specific property was held by the foundation for investment, or otherwise.

In these circumstances, it was not unreasonable for the Treasury to adopt the acceptable interpretation it did—a construction which is relatively effortless to administer and does not call for individual inquiries for each separate foundation. It is comparatively easy to decide whether a property is "of a type which generally produces interest, dividends, rents, royalties"—*e.g.*, stocks, bonds, rental real estate, mortgages. One does not have to consider the individual taxpayer's particular circumstances. Obviously, it is appropriate to take account of such ease of enforcement where the preferred interpretation does not trench on the statutory meaning.

Taxpayer charges internal inconsistencies within the regulation because in other parts it employs the word "used" to mean actually used. But these other portions of the regulation do not involve "used" as contained in § 4940(c)(4)(A)—the only clause we are passing upon—but, rather, other sections of the statute which have different purposes and contexts, as well as different wording. It is not improper for the Treasury deliberately to use the same word in varying senses so long as its regulation does not attribute those different meanings to the same statutory word and concept.

## IV.

Greenacre insists, too, that the regulation's interpretation of § 4940(c)(4)(A) runs against the legislative history of the tax imposed by § 4940, and for that reason cannot be accepted (even though it might otherwise be consistent with Congress' wording). We do not see any such conflict.

Taxpayer's point is that (1) the House of Representatives' bill proposed to lay a flat percentage tax on a foundation's net investment income (H.Rep. No. 413, 91st Cong., 1st Sess. (1969), 1969–3 Cum.Bull. 200, 213–14) while the Senate planned a user or audit fee measured by a percentage of a foundation's noncharitable assets (S.Rep. No. 552, 91st Cong. 1st Sess., 27 (1969), U.S.Code Cong. & Admin.News 1969, p. 1645, 1969–3 Cum.Bull. 423, 441–42); and (2) the full Congress adopted the House approach and its language taxing investment income, rather than the Senate's. The conclusion taxpayer draws is that the Treasury Regulation reinstates the rejected Senate version of a tax on the noncharitable assets by (it is claimed) imposing a tax on all noncharitable assets.

Unlike taxpayer, we find no help (for our present problem) in this history. The House proposal and the statute both impose a tax on "net investment income" (including "net capital gain"),[7] as does the Treasury Regulation which permits inclusion of stocks only if they were "held for investment purposes." When the regulation goes on to define property "of a type which generally produces ... dividends" as being automatically "held for investment purposes," the regulation does not conflict at all with the legislative history taxpayer invokes—a history which wholly fails to cover or allude to that precise point. The Treasury Department was not adopting the Senate plan, but simply defining as "held for investment purposes" a class of property which normally does produce the kinds

---

**7.** This tax seems to have been viewed by both houses as a sort of user fee on private foundations, imposed because of the expense of enforcing and administering the other, regulatory aspects of the legislation on private foundations.

*See* H.Rep. No. 413, *supra*, 1969–3 Cum.Bull. at 213; S.Rep. No. 552, *supra*, 1969–3 Cum.Bull. at 440–42. (The Conference Report does not mention the purpose of the tax. Conf.Rep. No. 782, 91st Cong., 1st Sess. at 278, 1969–3 C.B. 644).

of income specified in the statute and which is often held for investment.[8]

Nor is there adequate reason, in our view, to doubt that the regulation serves the statutory purpose. The Claims Court observed that it is "difficult to discern how these purposes will be served" in this instance, 6 Ct.Cl. at 114, but that position seems based on the mistaken premise that the purpose of the § 4940(a) tax was to curb abuses by private foundations and to assure that such foundations' investments were not jeopardized by financial speculation. Those were indeed the objectives of other parts of the 1969 legislation respecting private foundations (*e.g.*, self-dealing; failure to distribute income; excess business holdings; investments jeopardizing charitable purposes), but they were not the purposes of the § 4940(a) tax which was to impose a type of user fee or tax to help pay for the administration of private foundations. *See* note 7, *supra.* For that special kind of tax, there is no reason to think that Congress desired to exclude donated stock which the foundation promptly sells and from which it reaps a good capital gain.

## V.

We end by stressing that we decide only the exact issue presented by this case, *i.e.*, the validity of that portion of the Treasury Regulation which provides that "property shall be treated as held for investment purposes even though such property is disposed of by the foundation immediately upon its receipt, if it is property of a type which generally produces interest, dividends, rents, royalties." We do not decide the legality or meaning of other parts of the regulation not involved in this case. In particular, we do not consider or pass upon the portion of the regulation which adds, as an independent class, "or capital gains through appreciation" to the types of income stated in § 4940(c)(4)(A) and set forth immediately, *supra.* [9] That addition is not presented in this case.

AFFIRMED.

---

**8.** Greenacre refers to an IRS memorandum (recommending adoption of the regulation) which attributes to Congress the attempt to distinguish between charitable and noncharitable assets. It is clear that this refers, not to the original and rejected Senate version, but solely to Congress' clear desire not to impose the § 4940(a) tax on charitable assets.

**9.** The Fifth Circuit has upheld the portion of the regulation which we also uphold, *Zemurray Foundation v. United States,* 687 F.2d 97 (5th Cir.1982), but has recently invalidated, as an independent basis for taxation, the portion ("or capital gains through appreciation") on which we do not pass. *See Zemurray Foundation v. United States,* 755 F.2d 404, decided by the Fifth Circuit on March 18, 1985, which reaffirmed the earlier *Zemurray* decision. The property in that case was held not to be of the type specifically enumerated in the statute (§ 4940(c)(4)(A)) and therefore not properly covered by the regulation.