SCHENLEY DISTILLERS, Inc., and Joseph S. Finch and Company, Appellants,

v.

UNITED STATES of America.

No. 12409.

United States Court of Appeals Third Circuit.

Argued March 6, 1958.

Decided May 8, 1958.

Thomas E. Dewey, New York City (Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Elder W. Marshall, Pittsburgh, Pa., Ralph T. Heymsfeld, Philip C. Scott, Kent V. Lukingbeal, Julian L. Weber, New York City, on the brief), for plaintiff.

Grant W. Wiprud, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., D. Malcolm Anderson, U. S. Atty., Washington, D. C., on the brief), for defendant.

Before BIGGS, Chief Judge, and GOODRICH and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

This appeal is from a judgment of the District Court for the Western District of Pennsylvania dismissing a complaint by the plaintiffs to recover certain distilled spirits taxes paid by them, W.D.Pa. 1957, 153 F.Supp. 898. There are two reasons set forth for claiming the refund. One is that the tax is a direct one which was not apportioned. The other is that the imposition of the tax violated due process of law. Both of these reasons

are grounded in part upon the operation of what is called the "force-out" provision.

Since the complaint was dismissed because the court thought it did not state a claim upon which relief could be granted, we shall take the allegation of facts there as correct for the purpose of this appeal.

The plaintiffs are distillers of whisky. It costs them about ninety-five cents to distill a gallon of whisky and put it in a barrel. However, this type of spirits is unfit for consumption until it has been aged for at least four years during which time there is quite a bit of evaporation. To provide for this commercial necessity, the tax imposed by the United States need not be determined and paid until withdrawal from a bonded warehouse which, under the law, must take place within eight years from the date of storage therein.[1] By the end of eight years interest, insurance, warehousing and evaporation bring the cost up to $2.11 a gallon. At the time the whisky in question in this case went into storage, between 1943 and 1947, the rate of taxation was $9.00 on each gallon.[2] In 1951 an additional $1.50 was imposed.[3] It will be noted that the taxes are many-fold the cost of the whisky itself.

As a tax upon the voluntary withdrawal of the spirits from bond, the plaintiffs do not complain of its legality whatever they may think of the desirability of having it so high. Under normal circumstances they bottle the whisky after withdrawal and sell it within sixty days, passing the tax, of course, on to the consumer. But the difficulty now is that since 1951 there has been a tremendous oversupply in the industry. Therefore, although the plaintiffs must pay the tax after eight years of storage, as they decided to do in this instance, they cannot sell the whisky withdrawn for the market until years later and then at ruinous prices which bring only a fraction of the tax cost, let alone any profit for the distillers. They can prevent exaction of this high rate by exporting[4] or sale for nonbeverage purposes,[5] again risking a glutted market and low prices, or by total destruction[6] or redistillation[7] within the eight-year period. In order to avoid this dilemma, the plaintiffs are attempting here to have this time requirement deleted from the statute on the ground that its presence makes the tax unconstitutional.

Narrowly, the plaintiffs seek to recover on two claims. The main one is to get back $1.50 for each gallon forced out during the four-year period from November 1, 1951 to September 30, 1955, the latter being the date of their refund claims. This amount, constituting 99.6% of the refund sought, was paid with respect to the increase in the tax enacted after the plaintiffs' whisky had been put in the warehouse. The plaintiffs assert that this portion is clearly a direct property tax and as such is valid only if apportioned, relying on the well-known income tax case of Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759, rehearing, 1895, 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108.

It is their contention that to be classified as indirect a tax must be levied either in circumstances where it can and will

1. Internal Revenue Code of 1939, § 2879 (b), 26 U.S.C.A. § 2879(b) (hereinafter cited as I.R.C.1939) ; Internal Revenue Code of 1954, § 5006(a) (2), 26 U.S.C.A. § 5006(a) (2) (hereinafter cited as I.R.C. 1954).

2. Revenue Act of 1943, c. 63, § 302(a), 58 Stat. 61, 26 U.S.C.A. § 1650.

3. Revenue Act of 1951, c. 521, § 451(a), 65 Stat. 524, 26 U.S.C.A. § 2800(a) (1).

4. I.R.C.1939, § 2885(a), 26 U.S.C.A. § 2885(a) ; I.R.C.1954, § 5247(a), 26 U.S.

C.A. § 5247(a). See also I.R.C.1954, § 5248(2–4), 26 U.S.C.A. § 5248 (2–4).

5. I.R.C.1939, §§ 3070(a), 3250(*l*), 26 U.S. C.A. §§ 3070(a), 3250(*l*) ; I.R.C.1954, §§ 5131(a), 5522, 26 U.S.C.A. §§ 5131(a), 5522.

6. I.R.C.1939, § 2901(a) (2), 26 U.S.C.A. § 2901(a) (2) ; I.R.C.1954, § 5011(b), 26 U.S.C.A. § 5011(b).

7. I.R.C.1939, § 2883(e), 26 U.S.C.A. § 2883(e) ; I.R.C.1954, § 5194(f), 26 U.S. C.A. § 5194(f).

be passed on to the consumer or in connection with an actual transaction, specified privilege or particular active use of the property other than the mere possession or ownership thereof. By no stretch of the imagination, they say, can this increase be called an excise on the act of distillation which took place before it was enacted. Furthermore, they argue, the tax bears no reasonable relationship to the marketing transaction because at the time it was paid there was no certainty when a sale would be made, if at all. Following this analysis, the plaintiffs urge that the 1951 increase of $1.50 was charged solely by virtue of their ownership of the spirits and, due to the disaster prices at which this stock was merchandised, was not retrievable through sale.

The second claim for relief comes for a refund of the full amount of the taxes paid between the two dates above mentioned for that part of the whisky withdrawn under the eight-year provision which they say they can show never became salable because of the continued loss by evaporation and shrinkage before a market became available.

It is conceded that Congress could have enacted a distillation tax. It is also conceded that the $9.00 rate, in effect when the spirits went into storage, could have been enacted as such a measure. But the plaintiffs urge the structure of the 1939 and 1954 Internal Revenue Codes makes it obvious that Congress did not enact a distillation tax because at distillation the amount of tax was not ascertainable. Stressed in support of this argument are the facts that the tax is determined only as to those gallons which have not evaporated [8] nor been disposed of in certain enumerated ways [9] before

payment is required and then only at the rate prevalent at that time. Therefore, they contend that even this amount, as applied to spirits forced out, bears the same infirmity of directness as the $1.50, although they evidently do not dispute the assumption that this sum was passed on to the consumer on eventual sale.

■ As will be noted the attack on the "force-out" clause depends on having to support the spirits tax as being one on the sale to the consumer. We do not believe that this is necessary and, therefore, reject the plaintiffs' argument. No one doubts, we suppose, that a valid excise can be placed on the distillation of spirits. There are certain features in both the 1939 and 1954 Internal Revenue Codes which indicate to us that this is exactly what Congress intended to do. The tax is "levied" [10] or "imposed" [11] on "all distilled spirits * * * produced in * * * the United States" and attaches "as soon as this substance is in existence as such." [12] When the whisky is not, as required by statute, placed in the warehouse, payment is required immediately.[13] These elements seem sufficient to classify all exactions made thereunder as indirect production taxes. In this view we are supported by the recent Court of Claims opinion in Erie R. R. v. United States, 1957, 156 F.Supp. 908. See also Thompson v. United States, 1891, 142 U.S. 471, 12 S.Ct. 299, 35 L.Ed. 1084.

We are not persuaded that the factors to which the plaintiffs point affect the impact of this tax as an excise. The allowances for evaporation, loss, redistillation and exportation and the lower rates afforded for industrial uses all appear to be in the nature of relief provisions designed to meet the peculiar technical and

8. I.R.C.1939, § 2901, 26 U.S.C.A. § 2901; I.R.C.1954, § 5011(a), 26 U.S.C.A. § 5011 (a).

9. See notes 4–7 supra.

10. I.R.C.1939, § 2800(a) (1), 26 U.S.C.A. § 2800(a) (1).

11. I.R.C.1954, § 5001(a) (1), 26 U.S.C.A. § 5001(a) (1).

12. I.R.C.1939, § 2800(c), 26 U.S.C.A. § 2800(c); I.R.C.1954, § 5001(b), 26 U.S. C.A. § 5001(b).

13. I.R.C.1939, § 2800(b) (2), 26 U.S.C.A. § 2800(b) (2); I.R.C.1954, § 5006(c), 26 U.S.C.A. § 5006(c).

economic problems of the distilling industry. The contention that it was not certain that the rate which attached at distillation was the one which would be paid because the legislature customarily makes new rates apply to that whisky previously produced does not change the fact that the tax accrued immediately and had to be paid within the specified time whether the rate was changed or not.[14]

What has been said above clearly sustains the $9.00 tax as an excise on distillation notwithstanding the "force-out" clause. Can the rate be increased without violating any constitutional provision? We think it can. An examination of American fiscal history will show that whisky, as a commodity, was taxed as early as 1791,[15] and that the scheme of taxation developed in the years following the Civil War has been in effect continuously, except for prohibition, to the present time. From their argument pertaining to the original rate it is obvious that the plaintiffs were aware that ever since 1894 whisky held in bond has been made subject to the new rates which are enacted from time to time. They themselves admit "nobody knew at distillation what the rate of tax would be upon withdrawal." If Congress, during the eight-year period given in which to pay the tax due, makes it $10.50 instead of $9.00 while maintaining the same general tax structure, that seems to come within the general rules which the courts have laid down with respect to the legality of retroactive provisions. See Milliken v. United States, 1931, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809; Cf. Wilgard Realty Co. v. Commissioner, 2 Cir., 1942, 127 F.2d 514. As a retroactive impost on distillation, this part of the tax likewise avoids invalidation as a direct tax on property.

It is not without significance that the bond which the taxpayers executed on the deposit of spirits called upon them to pay "the tax imposed by law, now or hereafter in force." Could that be called an unconstitutional bargain? We think not.

The Government also gives us the theory that the tax in question has a double aspect. The first is that of distillation, already discussed. The second is the privilege of holding spirits in bond. Taxpayers say there was no "privilege" of holding spirits in bond because they had to put the spirits there whether they would or not.[16] But they were not compelled to keep them there. They could have removed them before this new $1.50 provision became effective or any other time within the eight-year period. And during the eight-year term of the bond they could have taken advantage of one of the tax avoidance plans previously mentioned. That this is a permissible type of excise on more than the bare ownership of property is indicated by Nicol v. Ames, 1899, 173 U.S. 509, 19 S.Ct. 522, 43 L.Ed. 786, where the tax was sustained upon the use of board of trade facilities. Under this theory, because the privilege is continuing, the $1.50 increase can be upheld as indirect without recourse to the permissible limits of retroactive impositions.

The argument under the due process clause is simpler. Here, the plaintiffs complain, was an exaction of five times the value of the property involved at a time when there was no market for it in which they could recover immediately the large amounts advanced. They can, the argument runs, demonstrate a complete confiscation as to the taxes paid on the whisky which subsequently evaporated and a not too slight inconvenience in bearing the burden for several years

14. Even this practice is based on the necessity of preventing the speculation that would take place if distillers holding whisky taxed at a lower rate would be entitled to compete with those who distilled after an increase had been enacted. See Howe, Taxation and Taxes in the United States 151–52 (1896), commenting

on the conditions existing before tax rate increases were made retroactive.

15. Act of March 3, 1791, c. 15, §§ 14, 15, 1 Stat. 203.

16. I.R.C.1939, § 2878(a), 26 U.S.C.A. § 2878(a); I.R.C.1954, § 5193(a), 26 U.S.C.A. § 5193(a).

until their product could be sold. It is then contended that there is no public advantage to compensate for such an unconscionable impact upon a private interest. In fact they allege the Government is harmed by the economic problems brought about by the "force-out" clause.

However, the plaintiffs' real trouble comes not from that clause, but what is for them an unfortunate business situation. Their complaint states the reason for the unusual supply of whisky in warehouses. Prior to or at about the time of the Korean trouble the distillers began making up extraordinarily large quantities of whisky. There were two reasons for this. One was that they feared restrictions upon manufacturers of the type experienced in World War II. The other was the expectation that excise taxes would be reduced and the possibility of a cheaper product would also tend to increase consumption. Both of these expectations proved to be untrue. There was no reduction in taxes, instead there was an increase. There were no restrictions placed upon manufacturers. So the quantity of material manufactured and stored was unusually high. In the meantime, public taste has, temporarily at any rate, changed. Much of the whisky which these plaintiffs have on hand is of a type suitable for blending with neutral spirits and unfit for use without that. And it just so happens that this blended whisky has experienced, according to the plaintiffs who should know, a diminishing demand on the part of consumers who want something else. The consequences are an oversupply and an under demand. The Government says that the plaintiffs "gambled and lost." We would not put it that way except in the sense that every business venture may be a "gamble." Our point is that the situation is one of economic conditions, not unconstitutional tax law.

■ If the demand for the plaintiffs' products had kept up and they could have sold this whisky as they took it out of the bonded warehouses within the time required there would be no complaint. The fact that they have had to pay a tax

because they have manufactured a presently unmerchantable article cannot, we think, render unconstitutional a tax which was perfectly valid before the market changed. This situation may, as the plaintiffs assert, result in loss of taxes to the Government. Whisky poured down the drain to avoid tax payment certainly does not help the United States Treasury. And a hard-pressed, money-losing distillery cannot pay the Government as much in taxes as though it were running at a profit. Granted all this is so, the solution of it is one for the Congress, not for the courts.

The judgment of the district court will be affirmed.