955 F.2d 1037
 69 A.F.T.R.2d 92-579, 92-1 USTC P 50,075
 BROWN-FORMAN CORPORATION (a Delaware corporation), successor
by merger to Brown-Forman Corporation (a Tennessee
corporation), Successor in Interest to Southern Comfort
Corporation (a Delaware corporation), Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 91-1108.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 19, 1991.
Decided Feb. 3, 1992.
Rehearing Denied March 17, 1992.
 
 Walter D. Haynes, argued, briefed, John B. Magee, Miller & Chevalier, Washington, D.C., for petitioner-appellant.
 Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S., Office of Chief Counsel, Gary R. Allen, Acting Chief, briefed, Richard Farber, David English Carmack, David A. Hubbert, argued, U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for respondent-appellee.
 Before NELSON and SUHRHEINRICH, Circuit Judges, and ENGEL, Senior Circuit Judge.
 SUHRHEINRICH, Circuit Judge.
 
 
 1
 The Brown-Forman Corporation appeals a decision of the United States Tax Court holding that, for the purposes of computing the overall profit percentage limitation, Treas.Reg. § 1.994-2(b)(3), the taxpayer's gross receipts are not reduced by federal excise taxes paid during the tax year. We affirm.
 
 
 2
 * The Brown-Forman Corporation now holds all the assets of the Southern Comfort Corporation ("Southern Comfort"). Southern Comfort engages in the production and sale of Southern Comfort liqueur for domestic consumption and for export to foreign markets. In 1981 and 1983, Southern Comfort conducted export sales through a Domestic International Sales Corporation ("DISC"), Jack Daniel International ("JDI").
 
 
 3
 Congress enacted legislation permitting the establishment of DISCs out of concern over the balance of trade. Congress found that tax considerations were causing domestic companies to supply foreign markets through foreign subsidiaries rather than by exporting domestically produced commodities. The DISC legislation was adopted as a vehicle through which domestic enterprises would receive a tax deferral for export-related income, providing an incentive to produce goods for export in the United States.
 
 
 4
 The actual process by which a DISC yields a tax deferral is fairly complicated. The DISC does not pay tax on its income. Instead, the DISC's shareholders, typically the domestic producer that conducts export activities through the DISC, are taxed on a specified percentage of the DISC's current income. The remainder of the DISC's income is not taxed until it is actually distributed to shareholders, the shareholders dispose of their stock, or the corporation ceases to qualify as a DISC. I.R.C. § 995(b)-(c). Thus, the more income allocated to the DISC, the greater the tax deferral.
 
 
 5
 The Internal Revenue Code provides three methods to determine the amount of income that may be allocated to a DISC. At issue in this case is the Combined Taxable Income method. This method allocates to the DISC fifty percent of the combined taxable income of the DISC and its related supplier, in this case Southern Comfort, attributable to export sales plus ten percent of the DISC's export promotion expenses. I.R.C. § 994(a)(2).[1] Combined taxable income is generally derived using the full costs involved in generating the export income. Thus, combined taxable income is equal to gross receipts from export sales minus the total costs of these sales to the DISC and its related supplier. Treas.Reg. § 1.994-1(c)(6).
 
 
 6
 As an exception to this general formula, the Commissioner of Internal Revenue has promulgated regulations allowing a taxpayer to compute combined taxable income using the marginal, rather than full, costs of the DISC and its related supplier. This exception applies only if the DISC is "seeking to establish or maintain a foreign market." Treas.Reg. § 1.994-2(a). However, the combined taxable income derived through marginal costing may not exceed the Overall Profit Percentage Limitation ("OPPL"). The OPPL restricts the combined taxable income from export sales of a DISC and its related supplier to "gross receipts (determined under [Treas.Reg.] § 1.993-6) ... multiplied by the overall profit percentage." Id. § 1.994-2(b)(3). The overall profit percentage is the combined worldwide taxable income of the DISC and its related supplier (including the related supplier's income from domestic sales) divided by its worldwide gross receipts, determined under § 1.993-6. Expressed mathematically,
 
 Combined Taxable
 
 7
 Comb. Taxable 

 
 
 8
 Income (export) Gross Receipts (export).
 
 
 9
 (worldwide)
 
 
 
 The effect of this provision is to allow a DISC that is establishing or maintaining an export market to use marginal costing only to the extent that the profitability of its export activities does not exceed the profitability of the corporation's worldwide activities, including domestic sales.
 In their original returns for 1981 and 1983, Southern Comfort and JDI did not use marginal costing to compute DISC commissions. However, Southern Comfort and JDI have filed amended returns for these years that utilize marginal costing. In computing the OPPL, Southern Comfort and JDI reduced worldwide gross receipts by the amount of federal excise tax paid.
 A federal excise tax is imposed on each proof gallon of distilled spirits sold for domestic consumption. I.R.C. § 5001(a)(1). This tax liability is represented by a lien attaching at the moment the distilled spirits are created. Id. § 5004. The lien and tax liability are extinguished when the spirits are exported. The distiller retains tax liability for spirits not exported, even after the distiller sells the spirits for consumption. Distillers, including Southern Comfort, typically recoup this liability by increasing the price of the spirits by a corresponding amount.
 The issue raised here is whether worldwide gross receipts include funds received in domestic sales that are used to pay the federal excise tax.
 II
 The regulations establishing the OPPL expressly adopt the definition of "gross receipts" contained in Treas.Reg. § 1.993-6, see Treas.Reg. § 1.994-2(b)(3); id. § 1.994-2(c)(2), which defines gross receipts as "[t]he total amounts received or accrued by the person from the sale or lease of property held primarily for sale or lease in the ordinary course of a trade or business...." Treas.Reg. § 1.993-6(a). "The total amounts received" plainly includes excise tax receipts.
 The Ninth Circuit construed a similar definition of gross receipts in Lucky Lager Brewing Co. v. Commissioner, 246 F.2d 621 (9th Cir.1957). At issue in Lucky Lager was interpretation of I.R.C. § 435, enacted to recapture "excess profits" that manufacturers received during the Korean War. In particular, the court was asked whether gross receipts included excise taxes paid by the manufacturer and passed on to its customers. The Ninth Circuit held that "[t]he language ... that 'gross receipts' are 'the total amount received or accrued ... from the sale ... of stock in trade' is irrefutably plain." Id. at 623 (quoting I.R.C. § 435(e)). The court continued, "[i]t is a logical absurdity to contend that the 'total amount received' from the sales is not what the customer paid but a lesser amount determined by a deduction of a particular tax paid, here required to be paid and in fact paid by the seller, before the delivery of the [goods]." Id.
 Southern Comfort urges us to ignore the definition in section 1.993-6 in favor of interpreting gross receipts under Treas.Reg. § 1.936-(5)(b)(5) (Q & A # 1). This regulation excludes federal excise taxes from the computation of gross receipts from sales of "possession products." But this section does not apply to DISCs. See I.R.C. § 936(f). Given the clarity of the definition of gross receipts in section 1.993-6, we are unmoved by Southern Comfort's argument.
 Southern Comfort contends that the OPPL is designed to limit export profitability, derived under marginal costing, to worldwide profitability. If worldwide profitability is computed without a reduction for excise taxes, the argument continues, worldwide profitability ceases to be a valid parameter because export profitability does not include excise taxes. This argument assumes its conclusion: that excise taxes are not a valid component of worldwide profitability.
 This assumption is misplaced. The federal excise tax is a cost of doing business. See Thompson v. United States, 142 U.S. 471, 12 S.Ct. 299, 35 L.Ed. 1084 (1892); Schenley Distillers, Inc. v. United States, 255 F.2d 334 (3d Cir.1958). Liability for the federal excise tax attaches when the distilled spirits come into existence and remains constant regardless of the price the customer pays. Southern Comfort did not add the excise tax separately to the sales price on customer invoices or otherwise differentiate this amount. It did not, and was not required to, maintain a separate bank account to hold and pay the excise tax. Because tax liability attached as soon as the distilled spirits were created, Southern Comfort was liable for the tax regardless of its ability to pass this cost on to customers. It is thus perfectly appropriate to consider excise taxes when determining profitability.
 III
 Southern Comfort also argues that the inclusion of federal excise taxes among its gross receipts exceeds the scope of the commissioner's authority. Treasury regulations are to be accorded deference and " 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.' " Commissioner v. Portland Cement Co., 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (quoting Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948)). Even greater deference is accorded to legislative regulations. Rowan Cos. v. United States, 452 U.S. 247, 253, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981).[2]
 According to Southern Comfort, Congress created DISCs to put exporters in the shoes of foreign subsidiaries. This, however, is inaccurate. Congress sought only to create an incentive for domestic corporations to export their goods. For instance, federal tax is generally not paid on the income of a foreign subsidiary until that income is distributed to the subsidiary's shareholders in the United States. However, DISCs must pay tax on a fixed percentage of their income in the year it is acquired, regardless of whether the DISC distributes any income. I.R.C. § 995(a). This discrepancy indicates that by establishing the DISC, Congress did not attempt or intend to replicate precisely the treatment of a foreign subsidiary. Even if gross receipts are not reduced by payments attributable to the federal excise tax, Southern Comfort receives a tax deferral through its DISC and may still employ marginal costing.
 Southern Comfort claims that the OPPL allocates the cost of excise taxes to export sales, which exceeds the Commissioner's authority because excise taxes are a solely domestic cost. This argument is misconceived. The OPPL does not allocate costs; it serves to limit the profitability under marginal costing of a DISC and its related supplier to the related supplier's worldwide profitability. Because no reduction for excise taxes is allowed, this cost decreases worldwide profitability and limits the combined taxable income of the DISC and its related supplier. However, the same is true for any other exclusively domestic cost.
 By accepting the validity of the OPPL scheme, Southern Comfort accepts that worldwide profitability is an appropriate limit on the use of marginal costing.[3] Although a particular cost of doing business is exclusively domestic, it may nevertheless be a valid component of worldwide profitability. As indicated earlier, federal excise taxes are properly viewed as a cost of doing business. See Thompson v. United States, 142 U.S. 471, 12 S.Ct. 299, 35 L.Ed. 1084 (1892); Schenley Distillers, Inc. v. United States, 255 F.2d 334 (3d Cir.1958). Thus, it is neither unreasonable nor inconsistent with the revenue statutes that gross receipts are not reduced to exclude payments attributable to the federal excise tax.
 IV
 For the foregoing reasons, we affirm the decision of the Tax Court.
 DAVID A. NELSON, Circuit Judge, dissenting.
 The taxpayer raises two issues in this appeal. The first involves the proper construction of the "overall profit percentage limitation" that the Commissioner's marginal costing rules (Treas.Reg. § 1.994-2) purport to impose for purposes of applying the combined taxable income price rule of 26 U.S.C. § 994(a)(2).
 The Commissioner interprets his marginal costing rules as imposing a profit limitation determined by taking worldwide taxable income from the product line in question, dividing this income by worldwide gross receipts that include a domestic excise tax component, and applying the resultant fraction to gross receipts from export sales. The taxpayer, on the other hand, would have us interpret the rules as permitting domestic excise taxes to be deducted from worldwide gross receipts.
 The Tax Court and the panel majority agree with the Commissioner's interpretation of the regulations. So do I. The regulations may be complicated, but it seems to me they are clear enough in saying that worldwide gross receipts include whatever portion of such receipts is attributable to domestic excise taxes.
 The second issue raised by the taxpayer is, for me, a more difficult one. The issue is this: Assuming the Commissioner's marginal costing rules say what the Commissioner says they say, do the rules represent a rational method of carrying out the task assigned to the Commissioner by Congress? On this issue I part company with my colleagues.
 In 26 U.S.C. § 994(b)(2), Congress directed the Commissioner to prescribe special rules for the allocation of expenditures "in those cases where a DISC is seeking to establish or maintain a market for export property." The statute furnishes the Commissioner no guidance on the content of the expenditure-allocation rules he is to prescribe for this class of cases, but the congressional committee reports furnish rather precise guidance. The reports of both the House Ways and Means Committee and the Senate Finance Committee have this to say on the subject:
 "It is expected that in the appropriate cases [i.e., "those cases where a DISC is seeking to establish or maintain a market for export property"] the regulations will allow, for purposes of applying the [26 U.S.C. § 994(a)(2) ] pricing rule, the combined taxable income on the sale of export property to reflect a profit equal to that which the DISC and a related party would earn if they took into account only the marginal costs of producing the property. The production expenses not considered marginal costs in this case would, of course, be allocable to the production of the related party which is not sold to the DISC." H.R.Rep. No. 92-533 at 75 (1972-1 Cum.Bull. at 538); S.Rep. No. 92-437 at 108 (1972-1 Cum.Bull. at 619) (emphasis supplied).
 What this says to me--and what I think it should have said to the Commissioner--is that the committees expected the Commissioner's marginal costing rules to allow export property income to reflect the income that would result if "only the marginal costs of producing the [export] property" were taken into account. (Emphasis supplied.) All other costs, the committee reports say, would "of course" be allocated to non-export property.[1]
 By no stretch of the imagination can excise taxes paid on products sold domestically be considered part of the marginal costs of producing property for sale abroad. Yet as the Tax Court specifically acknowledged at page 29 of its opinion in this case, "the fact" is that the application of the Commissioner's overall profit percentage limitation "results in the allocation of some excise tax costs to gross receipts from export sales...."
 In computations submitted to the Tax Court on behalf of the Commissioner after the Tax Court opinion was issued (Jt.App. p. 84), the Commissioner set forth the exact dollar amount of the taxpayer's domestic excise taxes "[a]llocable" to export sales under the marginal cost method endorsed by the Tax Court. (Jt.App. p. 93.) For tax year 1981, the excise taxes thus allocable to export sales came to $1,311,137.45--which is more than 22 percent of the total costs considered allocable to export sales. Id.
 The Commissioner contends that his marginal costing rules do not really result in the allocation of excise taxes to export sales, despite what his own computations show, because excise taxes are merely included in an overall profit percentage formula used "to limit the amount of profit that could be earned by the DISC from export sales under the marginal costing method." Brief of respondent-appellee, p. 15. The Commissioner may be correct in a purely formal sense, but not, I think, in any substantive sense.
 The entire purpose of the marginal cost regulations--or so Congress thought--was to provide for the allocation of expenditures under a method showing what the DISC and its parent would earn if they took into account "only" the marginal costs of producing the property. It seems to me indisputable that the practical effect of the non-statutory "overall profit percentage limitation" adopted by the Commissioner is to allocate to export sales not only the marginal costs of producing the export property, but also a portion of the excise taxes paid on property sold in this country.
 My colleagues suggest that other exclusively domestic costs may also play a part in lowering export earnings, under the Commissioner's rules. If so, it seems to me that the rules are even more irrational than the taxpayer has claimed. The taxpayer having challenged only the inclusion of excise taxes, however, I would not go beyond those taxes in granting relief.
 Because of the way in which it disposed of this case, the Tax Court did not find it necessary to address the issue of whether the taxpayer's domestic international sales corporation was a qualified DISC during the years at issue. I would therefore remand the case for a resolution of this issue. Should the Tax Court conclude that the DISC was in fact qualified, I would ask the court to compute the combined taxable export income of the DISC and its parent without taking into account the excise taxes paid by the parent on its domestic production.
 
 
 [1]
 Section 994(a)(1) allows a DISC to earn taxable income equal to four percent of combined taxable income plus 10% of its export promotion expenses. Section 994(a)(3) allows a DISC to earn income based on the actual price charged by its related supplier, subject to the arm's length pricing rules of section 482
 These rules apply to "buy/sell" DISCs, those that actually purchase product from a related supplier and resell them on an export market. Some DISCs, such as JDI, never actually purchase the product exported. Instead, they arrange export sales on a commission basis. These are referred to as commission DISCs. Section 994(b) directed the commissioner to promulgate regulations governing the computation of taxable income for commission DISCs in a manner consistent with the three methods set forth in section 994(a). In Treas.Reg. § 1.994-1(c)(1)-(4), the commissioner established rules that give commission DISCs the same options for income computation that are available to buy/sell DISCs.
 
 
 [2]
 A legislative regulation is promulgated pursuant to specific congressional direction. An interpretive regulation is issued in the absence of a specific directive in order to interpret a congressional enactment. The OPPL is a legislative regulation promulgated in response to I.R.C. § 994(b)(2), which directed the commissioner to prescribe "rules for the allocation of expenditures in computing combined taxable income ... where a DISC is seeking to establish or maintain a[n export] market." Id
 
 
 [3]
 In considering marginal costing, the House and Senate committees both stated:
 Where a DISC is attempting to establish a market abroad, or seeking to maintain a market abroad, for exports, the Secretary of the Treasury may prescribe by regulations special rules governing the allocation of expenses incurred on the sale of the export property for purposes of determining the combined taxable income of the related person and the DISC. It is expected that in the appropriate cases the regulations will allow, for purposes of applying the second pricing rule, the combined taxable income on the sale of export property to reflect a profit equal to that which a DISC and a related party would earn if they took into account only the marginal costs of producing the property.
 H.R.Rep. No. 92-533, at 75; S.Rep. No. 93-427, at 108. We read this passage to indicate an intent to have the commissioner promulgate marginal costing rules "in the appropriate cases." The dissent defines appropriate cases as any instance where a DISC is attempting to establish or maintain an export market. However, the report's first sentence directs the commissioner to issue regulations governing the allocation of expenses between a DISC and its related supplier for DISCs seeking to establish or maintain an export market. The second sentence directs the commissioner to promulgate marginal costing regulations in the appropriate cases. Given this structure, "in the appropriate cases" modifies attempting to establish or maintain an export market; that is, not all instances where a DISC is attempting to establish or maintain an export market are appropriate cases for full marginal costing, and the OPPL determines the extent to which it is appropriate for a particular DISC to use marginal costing. As we have explained, the OPPL limits the use of marginal costing to worldwide profitability. In so doing, the commissioner has determined "the appropriate cases" to be those cases in which export profitability does not exceed worldwide profitability. This does not exceed the scope of the commissioner's authority.
 
 
 [1]
 Committee reports are not legislation, to be sure, but the Commissioner makes no contention here that the very general language of 26 U.S.C. § 994(b)(2) should not be read in light of the very specific language of the committee reports