**DOW CORNING CORPORATION,**
**Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–**
**Appellee.**

**No. 90–5150.**

United States Court of Appeals,
Federal Circuit.

Jan. 14, 1993.

Raymond J. Wiacek, Jones, Day, Reavis & Pogue, Washington, DC, argued for plaintiff-appellant.

David A. Hubbert, Dept. of Justice, Washington, DC, argued for defendant-appellee. With him on the brief was Gary R. Allen. Of counsel were Steven W. Parks and David English Carmack.

Before ARCHER, Circuit Judge, COWEN, Senior Circuit Judge, and MICHEL, Circuit Judge.

ARCHER, Circuit Judge.

Dow Corning Corporation (Dow Corning) appeals from the summary judgment of the United States Claims Court,[1] No. 255–87T (July 3, 1990), upholding the validity of section 1.994–2(b)(3) of the Treasury Regulations. 26 C.F.R. § 1.994–2(b)(3) (1981). That section of the regulations provides for an overall profit percentage limitation (OPPL) on the marginal costing method of allocating export sales income to a Domestic International Sales Corporation (DISC)

---

1. The Claims Court was renamed the Court of Federal Claims on October 29, 1992. Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506 (1992).

for federal income tax purposes. *See* 26 U.S.C. (IRC) §§ 991–997 (1982).[2] We affirm.

## I.

In 1971, Congress enacted the DISC provisions to afford tax incentives to United States corporations engaged in export sales. Dow Corning formed a wholly-owned subsidiary, Dow Corning International Sales Corporation (Sales) which, during the years at issue in this case, 1976–1981, qualified as a DISC within the meaning of IRC § 992(a).

Generally, the DISC provisions permitted deferral of federal income taxes on a portion of the export sales or commission income allocable to the DISC. The DISC itself was not subject to tax. IRC § 991. Part of the DISC's income, however, was currently taxed to the DISC's shareholders as though received as a dividend. The balance of such income was not taxed to the shareholders until distributed (or on the happening of certain events). IRC § 995.[3]

For purposes of determining the income allocable to the DISC, IRC § 994[4] set forth intercompany pricing rules describing permissible methods for determining the transfer prices between a related corporation and the DISC for property sold by the DISC overseas. The transfer pricing method pertinent here permitted the DISC to derive taxable income equal to 50 percent of the combined taxable income of the related party and the DISC on the export sales. IRC § 994(a)(2). If the DISC did not purchase the export property from a related corporation but merely acted as a commission or sales agent, as Sales did for Dow Corning in this case, the statute required regulations to be prescribed setting forth rules consistent with the transfer pricing rules of IRC § 994(a) to cover commissions, rentals and other income. IRC § 994(b)(1). The regulation issued by the Secretary permitted the same 50 percent of taxable income from export sales made by a commission DISC to be allocated to the DISC.

For a DISC seeking to establish or maintain a foreign market for export property the statute further provided that the Secretary was to prescribe regulations setting forth "rules for the allocation of expenditures" in computing the combined taxable income of the DISC and the related corporation. IRC § 994(b)(2). As the heading to IRC § 994(b) and its legislative history indicate, Congress contemplated that marginal costing to compute the income on export sales would be made a part of these rules. *See* H.R.Rep. No. 533, 92d Cong., 1st Sess. 1, 75 (1971), *reprinted in* 1972–1 C.B. 538; S.Rep. No. 437, 92d Cong., 1st Sess. 1, 108 (1971), *reprinted in* 1972–1 C.B. 619.

---

**2.** Unless otherwise indicated, all references are to the Internal Revenue Code of 1954, as amended, because the tax years involved in this proceeding are 1976–1981.

**3.** For a more complete explanation of the DISC statute, *see Thomas International Ltd. v. United States,* 773 F.2d 300 (Fed.Cir.1985), *rev'g* 6 Cl.Ct. 414 (1984) and *Caterpillar Tractor Co. v. United States,* 218 Ct.Cl. 517, 589 F.2d 1040 (1978).

**4.** Sec. 994. Inter-company pricing rules
   (a) In general
     In the case of a sale of export property to a DISC by a person described in section 482, the taxable income of such DISC and such person shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of

     •   •   •   •   •

     (2) 50 percent of the combined taxable income of such DISC and such person which is attributable to the qualified export receipts on such property derived as the result of a sale by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts, . . . .

     •   •   •   •   •

   (b) Rules for commissions, rentals, and marginal costing
     The Secretary shall prescribe regulations setting forth—
     (1) rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income, and
     (2) rules for the allocation of expenditures in computing combined taxable income under subsection (a)(2) in those cases where a DISC is seeking to establish or maintain a market for export property.
26 U.S.C. § 994 (1982).

The Commissioner promulgated Treasury Regulation § 1.994–2, 26 C.F.R. § 1.994–2 (1981), for this purpose. The DISC and its related supplier were permitted, subject to some limitations not here pertinent, to determine what "marginal or variable costs" should be taken into account in computing the income allocable to the DISC. Thus, the regulation provided:

(1) *In general.* Marginal costing is a method under which only marginal or variable costs of producing and selling a particular item, product, or product line are taken into account for purposes of section 994. Where this section is applicable, costs attributable to deriving qualified export receipts for the DISC's taxable year from sales of an item, product, or product line may be determined in any manner the related supplier (as defined in § 1.994–(1)(a)(3)(ii)) chooses, provided that the requirements of both subparagraphs (2) and (3) of this paragraph are met.

(2) *Variable costs taken into account.* There are taken into account in computing the combined taxable income of the DISC and its related supplier from sales of an item, product, or product line the following costs: (i) Direct production costs (as defined in § 1.471–11(b)(2)(i))....

Treas.Reg. § 1.994–2(b)(1), (2) (1981). In section 1.994–2(b)(3) the regulation imposed an overall profit percentage limitation (OPPL) on the export sales to which marginal costing applied, as follows:

(3) *Overall profit percentage limitation.* As a result of such determination of costs attributable to such qualified export receipts for the DISC's taxable year, the combined taxable income of the DISC and its related supplier from sales of such item, product, or product line for the DISC's taxable year does not exceed gross receipts (determined under § 1.993–6) of the DISC derived from such sales, multiplied by the overall profit percentage (determined under paragraph (c)(2) of this section).

Treas.Reg. § 1.994–2(b)(3) (1981). The overall profit percentage for purposes of this limitation was defined in § 1.994–2(c)(2) as follows:

(c) *Definitions* —

.    .    .    .    .

(2) *Overall profit percentage.* (i) For purposes of this section, the overall profit percentage for a taxable year of the DISC for a product or product line is the percentage which—

(a) The combined taxable income of the DISC and its related supplier plus all other table income of its related supplier from all sales (domestic and foreign) of such product or product line during the DISC's taxable year, computed under the full costing method, is of

(b) The total gross receipts (determined under § 1.993–6) from all such sales.

Treas.Reg. § 1.994–2(c)(2)(i) (1981).

Because of the OPPL, use of the marginal costing provisions could not produce a combined taxable income on the DISC's export sales which exceeded the profit percentage derived by the related supplier from all of its worldwide sales (domestic and foreign) of the particular product or product line. The validity of the OPPL limitation, § 1.994–2(b)(3) of the regulation promulgated under IRC § 994(b)(2), is at issue in this case.

## II.

Dow Corning and Sales originally filed their tax returns for the years 1976–81 using the 50 percent combined taxable income method of allocating income to Sales together with the marginal costing adjustments. In accordance with Treas.Reg. § 1.994–2(b)(3), the companies computed the amount of combined taxable income of Dow Corning and Sales by using marginal costing and applying the OPPL.

In 1984, Dow Corning filed amended returns for Sales for the years 1976–81 which reflected an increase in the taxable income allocated to Sales. The increased income arose solely because Dow Corning did not apply the regulatory limitation of the OPPL to the combined taxable income.

Dow Corning also filed claims for refund (form 1040X) for 1976–81 based in part on the decrease in its income resulting from the allocation of greater income to Sales.

After the Internal Revenue Service denied these claims for tax refunds, Dow Corning sued for refund in the Claims Court. The parties stipulated in a manner to present the single legal issue of whether reduction of income allocable to Sales due to the regulatory OPPL was contrary to the DISC statute. Dow Corning filed a motion for summary judgment contending that its marginal costing computation, without being limited by the OPPL, was proper. A cross motion for summary judgment was filed by the United States seeking to have the validity of the regulation, including the OPPL limitation, upheld. The Claims Court granted summary judgment in favor of the United States and this appeal followed.

## III.

Dow Corning contends that the Claims Court erred as a matter of law in upholding the validity of the Treas.Reg. § 1.994–2(b)(3), arguing that the regulation is inconsistent with the expressed intent of Congress as set forth in the Senate and House of Representatives Reports accompanying the enactment of the DISC statute. Dow Corning relies on the following statement, and more particularly on the underlined words, from those reports to support its position:

> Where a DISC is attempting to establish a market abroad, or seeking to maintain a market abroad, for exports, the Secretary of the Treasury may prescribe by regulations special rules governing the allocation of expenses incurred on the sale of the export property for purposes of determining the combined taxable income of the related person and the DISC. It is expected that in the appropriate cases the regulations will allow, for purposes of applying the second pricing rule, the combined taxable income on the sale of export property to reflect a profit equal to that which the DISC and a related party would earn if they took into

account <u>only the marginal costs</u> of producing the property. The production expenses not considered marginal costs in this case would, of course, be allocable to the production of the related party which is not sold to the DISC. [Emphasis added.]

H.R.Rep. No. 533, 92d Cong., 1st Sess. 1, 75 (1971), *reprinted in* 1972–1 C.B. 538; S.Rep. No. 437, 92d Cong., 1st Sess. 1, 108 (1971), *reprinted in* 1972–1 C.B. 619. By focusing on the words "only the marginal costs," Dow Corning argues that the Secretary ignored a clear directive of Congress when promulgating the regulations, and that the OPPL should, therefore, be invalidated.

■ "The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner." *United States v. Correll*, 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967). "Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.'" *Commissioner v. Portland Cement Co.*, 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (quoting *Commissioner v. South Tex. Lumber Co.*, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948)). Although there was some dispute below as to whether the regulation at issue was "legislative" or "interpretative," the parties appear to agree for purposes of this appeal that the regulations should be considered to be merely interpretative. Such a regulation is valid if it "harmonizes with the statute's 'origin and purpose.'" *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982) (citations omitted).

■ The starting point for determining whether a regulation satisfies these requirements for validity is, of course, the statutory language itself. *See Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). In this case the statute provides only that the Secretary shall prescribe rules for the allocation of expendi-

tures in computing combined taxable income in those cases where a DISC is seeking to establish or maintain a foreign market. IRC § 994(b)(2). It makes no mention of marginal costing in the text. The heading to IRC § 994(b) does refer to marginal costs, but headings in the Internal Revenue Code do not have substantive effect. *See Railroad Trainmen v. Baltimore & O. R.R.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646 (1947). Thus, there is no specific language in the statute requiring the Secretary to use marginal costing in implementing IRC § 994(b)(2).

The reports of the Senate and House of Representatives contain only the brief commentary, quoted above, indicating that Congress did contemplate some use of marginal costing. The first sentence of the quoted history conveys essentially the same thought as the statute itself, *i.e.,* that the Secretary shall prescribe special rules for the allocation of expenses where a DISC is attempting to establish or maintain a market abroad. Dow Corning argues that the second sentence is a mandatory direction to the Secretary to allow the use of "only the marginal costs" for expense allocation purposes when a market abroad is being established or maintained by a DISC. We do not agree that these words read in context so restrict the Secretary's grant of regulatory authority.

The Sixth Circuit analyzed this legislative history language in *Brown–Forman Corp. v. Commissioner,* 955 F.2d 1037 (6th Cir.1992) *aff'g,* 94 T.C. 919 (1990), and concluded that the sentence containing the words "only the marginal costs" did not require the Commissioner to permit marginal costing in every case where a DISC was attempting to establish or maintain a foreign market. The court stated:

> The second sentence directs the commissioner to promulgate marginal costing regulations *in the appropriate cases.* Given this structure, ... *not all instances* where a DISC is attempting to establish or maintain an export market are appropriate cases for full marginal costing, and the OPPL determines the extent to which it is appropriate for a particular DISC to use marginal costing. As we

have explained, the OPPL limits the use of marginal costing to worldwide profitability. In so doing, the commissioner has determined "the appropriate cases" to be those cases in which export profitability does not exceed worldwide profitability. This does not exceed the scope of the commissioner's authority.

955 F.2d at 1042 (emphasis added).

When the discussion of marginal costing in the Senate and House Reports is considered in conjunction with other provisions of the reports and the statute, we also conclude that Congress intended to give the Secretary discretion and latitude in deciding just how and when marginal costing would be allowed. The Secretary was instructed to promulgate "special rules" and in doing so he was expected "in appropriate cases" to permit marginal costing. Interpreting the history in this manner is wholly consistent with the essentially unrestricted grant of regulatory authority given to the Secretary by the words of the statute. Moreover, the structure of the DISC statute warrants this construction because the special rules of § 994(b)(2) are exceptions to the general rules under § 992(a) for allocating income to the DISC.

■ Marginal costing is an economic concept. *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1114 (7th Cir.1983). In other contexts courts have recognized that the concept of "marginal costs" cannot be reduced to a sum certain by conventional accounting methods. *Id.* The term "marginal costs" is not used elsewhere in the Internal Revenue Code and has no defined meaning in the tax law. Yet the DISC statute and its legislative history contemplate that the Secretary will import this elusive economic concept into the tax law and give it meaning. It is entirely appropriate, therefore, that Congress would provide the Secretary with considerable discretion to determine how marginal costing should be implemented. Where Congress has delegated authority to prescribe rules and uses terms that lack specific definition, greater latitude is afforded the Secretary than in those situations where the terms have well defined meanings. *United States v. Vogel Fertil-*

*izer,* 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982). Under these circumstances the regulation in controversy must be upheld if it implements the "congressional mandate in some reasonable manner." *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 476, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979) (citations omitted).

▆ We are convinced that congressional intent has been reasonably implemented by the OPPL regulation. Once the DISC satisfies the regulatory criteria for showing that it is establishing or maintaining a foreign market, Treas.Reg. § 1.994–2(b) permits the DISC's taxable income to be determined by the taxpayer by any marginal or variable costing method it deems appropriate, provided that two conditions are met. The first is that direct production costs—direct labor and material—must be taken into account in arriving at the DISC's taxable income.[5] The second condition is that the combined taxable income of the DISC and its related supplier cannot exceed the gross receipts from foreign sales times the overall profit percentage of all sales, both foreign and domestic, of the product or product line.

The government asserts that this second condition will produce a combined taxable income that is greater than the income that would result from full costing but less than the income that would result from considering only the variable costs of direct labor and materials. It argues that this bright-line, simple formula, which is easy to use and to administer, results in an approximation of variable costs or marginal costs in appropriate cases.

Dow Corning, on the other hand, contends that the second condition in the regulation severely and unduly reduces the income that it would obtain using full marginal costing. It argues that the marginal costing computation should take into account only direct labor and material cost of the product, or, alternatively, that properly defined and computed marginal costs should be determined only after a full trial.

These, and similarly conflicting arguments, made by the parties illustrate the wisdom of giving deference to the Treasury Regulation in this case where broad regulatory authority has been delegated to the Secretary by the statute. The regulation promulgated by the Secretary does not represent the only approach that could have been chosen to provide for the allocation of income from export sales where the DISC is seeking to establish or maintain a foreign market. Dow Corning's position of using only direct labor and material might have been selected. Or, the Secretary could have spelled out elaborate rules for ascertaining "true" marginal costs in the economic sense; this would have involved choices among many elusive economic concepts and theories similar to what Dow Corning contemplates should occur in a remand for trial in this case. Instead, the Secretary's regulation implemented this provision of the DISC statute by giving taxpayers an additional benefit through an easily determined formula which allowed them to increase the 50 percent of combined taxable income allocable to the DISC under the general rule of IRC § 994(a)(2) by deducting only certain variable costs (primarily direct materials and labor) and then apply the OPPL. This prevented taxable income, after deducting only direct labor and material, from exceeding the normal (overall) profitability of the product.

Thus, the OPPL operates as an allocation rule as contemplated by the statutory language directing the Secretary to prescribe "rules for the allocation of expenditures." It has the effect in most cases of allocating indirect costs to the exported product in those circumstances where the profit margin using only direct production costs would exceed the worldwide profit margin for all product sales.

The reasonableness of the OPPL rule was considered by the United States Tax Court in the *Brown–Forman* case. After noting that the OPPL makes the marginal costing provision "beneficial only to those taxpayers whose profit margins for export sales—determined under a full costing

---

5. The regulation also requires that certain of the DISC's export promotion expenses be taken into account. Treas.Reg. § 1.994–2(b)(2).

method—is less than their worldwide profit margin with respect to such product or product line," the Tax Court stated:

> We find such effect reasonable in that it excludes from marginal costing taxpayers who logically would not need special tax incentives to be encouraged to export—*i.e.*, those taxpayers whose export profit margin already is higher than their worldwide profit margin with respect to the product in question. Taxpayers already enjoying a higher profit margin on export sales than on worldwide sales of a product or product line hardly would be seen to be those Congress had in mind when it granted the Commissioner regulatory authority in section 994(b)(2) to allow special rules for those "seeking to establish or maintain a market for export property."

*Brown–Forman Corp. v. Commissioner*, 94 T.C. 919, 945 (1990) (footnote omitted), *aff'd*, 955 F.2d 1037 (6th Cir.1992).

Where Congress expressed its expectation that marginal costing would be permitted in appropriate cases but left the implementation to the Secretary's regulations, we cannot say that the regulation at issue does not "harmonize with the statute's 'origin and purpose.'" *United States v. Vogel Fertilizer*, 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982) (citations omitted). The Supreme Court has stated: "Improvements might be imagined ... [but the courts] do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not the courts, the task...." *United States v. Correll*, 389 U.S. 299, 306–307, 88 S.Ct. 445, 449–450, 19 L.Ed.2d 537 (1967) (footnote omitted). In our view this is a case where the task of implementing the marginal cost provision was given to the Secretary, not the courts.

## CONCLUSION

For the reasons discussed above, the decision of the Claims Court is

AFFIRMED.