T.C. Memo. 2018-152

UNITED STATES TAX COURT

MITSUBISHI CEMENT CORPORATION & SUBSIDIARIES, A DELAWARE
CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 7161-16.                    Filed September 13, 2018.

Paul W. Jones, for petitioner.

Michael W. Tan and Aely K. Ullrich, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  In our prior opinion in this case, Mitsubishi Cement Corp.

& Subs. v. Commissioner (Mitsubishi I), T.C. Memo. 2017-160, we decided two

_____

[*]This opinion supplements our previously filed opinion Mitsubishi Cement
Corp. & Subs. v. Commissioner, T.C. Memo. 2017-160.

[*2] issues regarding the determination of petitioner's allowable depletion deductions for 2011 and 2012. We held that petitioner must apply a percentage depletion rate of 14% and that it may not include the costs of certain purchased minerals as mining costs in calculating gross income from mining under the proportionate profits method, as provided in section 1.613-4(d)(4), Income Tax Regs. After we issued Mitsubishi I, trial was held to decide the remaining issue, which is the correct determination of petitioner's gross sales for the purpose of the proportionate profits method. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The background facts on which we relied in Mitsubishi I were fully stipulated. Those facts are for the most part relevant to the issue we address in this opinion, and we incorporate certain of them verbatim from Mitsubishi I. The parties filed a supplemental stipulation of facts, and the additional stipulated facts are incorporated in our findings by this reference. We also find facts based upon the evidence presented at trial.

**[\*3]** Petitioner's principal place of business was Nevada when it filed the petition. Its largest shareholder is Mitsubishi Materials Corp. (MMC) in Japan. MMC owns 67% of petitioner.

Petitioner's primary business activity is the production of finished cement at its Cushenberry Cement Plant (Cushenberry) near Victorville, California. Petitioner mines calcium carbonates at Cushenberry, and it purchases other minerals from third parties. It mixes the mined calcium carbonates with the purchased minerals to produce finished cement. Generally petitioner sells the cement to customers that combine it with gravel, sand, and water to produce ready-mix concrete. The market in which it sells cement includes the southern tip of Nevada and southern California, with the largest portion of its sales occurring in or around Los Angeles, California.

Petitioner produces only Portland cement. It produces several types of Portland cement, each of which has a different chemical composition and may be used for a different purpose. Specifically, petitioner produces and sells Type II/V cement, Type III "light" cement, block cement, plastic cement, and premium oil well cement. Each type of cement that petitioner sells to customers is certified to meet industry standards set by the American Society for Testing and Materials

[*4] (ASTM).  Cement producers use ASTM standards to certify that their products meet the grade and quality specifications for specific types of cement.

During the years in issue most of petitioner's sales were to the subsidiaries of MCC Development Corp. (MCCD).  MMC owns 70% of MCCD, and petitioner's president, Kimball McCloud, is also president of MCCD.  MCCD owns 100% of each of three subsidiaries:  Robertson's Ready Mix (Robertson's R/M), Nevada Ready Mix (Nevada R/M), and Service Rock Products (Service Rock) (collectively, MCCD subsidiaries).  During the years in issue MCCD also owned a 30% interest in Superior Ready Mix (Superior).  In addition to its sales to MCCD subsidiaries, petitioner made sales to Superior, and it made sales to a number of purchasers in which MCCD held no interest (collectively, with Superior, noncontrolled purchasers).

During the years in issue petitioner sold Type II/V cement and Type III cement to MCCD subsidiaries.  It did not sell plastic, block, or premium oil well cement to MCCD subsidiaries.  The following table reflects petitioner's actual gross sales for 2011.

[*5]

## Type II/V cement

| Purchaser | Tons | Price | Price per ton |
| --- | --- | --- | --- |
| Robertson's R/M | 960,581 | $51,871,371 | $54.00 |
| Nevada R/M | 26,897 | 1,828,993 | 68.00 |
| Service Rock | 35,364 | 2,404,759 | 68.00 |
| Noncontrolled purchasers | 225,370 | 14,738,512 | 65.40 |
| Total | 1,248,212 | 70,843,635 | |

## Type III cement

| Purchaser | Tons | Price | Price per ton |
| --- | --- | --- | --- |
| Robertson's R/M | 3,710 | $356,159 | $96.00 |
| Noncontrolled purchasers | 41,671 | 4,018,851 | 96.44 |
| Totals | 45,381 | 4,375,010 | |

## Block cement

| Purchaser | Tons | Price | Price per ton |
| --- | --- | --- | --- |
| Noncontrolled purchasers | 44,630 | $3,666,416 | $82.15 |
| Totals | 44,630 | 3,666,416 | |

## Plastic cement

| Purchaser | Tons | Price | Price per ton |
| --- | --- | --- | --- |
| Noncontrolled purchasers | 4,194 | $274,215 | $65.38 |
| Totals | 4,194 | 274,215 | |

**[*6]**                    <u>Premium oil well cement</u>

| Purchaser | Tons | Price | Price per ton |
|---|---|---|---|
| Noncontrolled purchasers | 11,664 | $1,166,366 | $100.00 |
| Totals | 11,664 | 1,166,366 | |

The following table reflects petitioner's actual gross sales for 2012.

<u>Type II/V cement</u>

| Purchaser | Tons | Price | Price per ton |
|---|---|---|---|
| Robertson's R/M | 1,059,403 | $57,207,755 | $54.00 |
| Nevada R/M | 46,346 | 2,981,442 | 64.33 |
| Service Rock | 61,739 | 3,975,128 | 64.39 |
| Noncontrolled purchasers | 245,902 | 15,625,665 | 63.54 |
| Totals | 1,413,390 | 79,789,990 | |

<u>Type III cement</u>

| Purchaser | Tons | Price | Price per ton |
|---|---|---|---|
| Robertson's R/M | 4,332 | $415,878 | $96.00 |
| Noncontrolled purchasers | 44,771 | 4,383,377 | 97.91 |
| Totals | 49,103 | 4,799,255 | |

[*7]

### Block cement

| Purchaser | Tons | Price | Price per ton |
|---|---|---|---|
| Noncontrolled purchasers | 47,039 | $3,949,581 | $83.96 |
| Totals | 47,039 | 3,949,581 | |

### Plastic cement

| Purchaser | Tons | Price | Price per ton |
|---|---|---|---|
| Noncontrolled purchasers | 6,672 | $454,878 | $68.18 |
| Totals | 6,672 | 454,878 | |

### Premium oil well cement

| Purchaser | Tons | Price | Price per ton |
|---|---|---|---|
| Noncontrolled purchasers | 12,681 | $1,268,076 | $100.00 |
| Totals | 12,681 | 1,268,076 | |

Petitioner prepares an annual letter that it sends to all of its customers to notify them of the prices that it intends to charge for cement for that year. Customers are able to contact petitioner's sales representatives to negotiate a lower price for their individual purchases. Generally, petitioner's prices for sales vary from customer to customer.

**[\*8]**  MCCD subsidiaries receive petitioner's annual pricing letters, and their managers may contact petitioner if they believe that the prices set are too high. However, McCloud controls the final decision regarding the prices that MCCD subsidiaries pay for their purchases.

On petitioner's income tax returns for the years in issue it claimed deductions for depletion pursuant to section 611 in connection with its mining of calcium carbonates.  It determined its depletion deductions using percentage depletion described in section 613 and the regulations thereunder.  For purposes of percentage depletion, petitioner calculated its gross income from mining using the proportionate profits method.  For both years in issue petitioner applied the proportionate profits method using its actual gross sales of finished cement, which were $80,325,643 for 2011 and $90,261,779 for 2012.

OPINION

I.    Percentage Depletion and Proportionate Profits Method

Section 611 provides that there shall be allowed as a deduction "a reasonable allowance for depletion".  Generally the deduction is calculated as a percentage of "the gross income from the property".  Sec. 613(a).  "Gross income from the property" in petitioner's case means "gross income from mining".  Sec.

**[\*9]** 613(c)(1).  The amount of the depletion deduction under section 613(a) can be expressed by the following formula:

$$\text{Gross Income From Mining} \times \text{Percentage Depletion Rate} = \text{Depletion Deduction}$$

Section 613(b) provides the percentage depletion rates for specific classes of minerals.  The statutory percentage depletion rate for calcium carbonates is 14%.  Sec. 613(b)(7); see Mitsubishi I, at \*8-\*9.  The other component of percentage depletion, gross income from mining, is determined according to the regulations.  See sec. 1.613-4, Income Tax Regs.

A taxpayer who conducts both mining and nonmining activities with respect to a given mineral (as in the manufacture of finished products) must make an allocation between gross income from the mining activity and gross income from the nonmining activity.  The percentage depletion rate is applied only to the gross income from mining.  Id. para. (a); see United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 86-87 (1960).  Under the general rule that applies in such a case, gross income from the mining activity is computed on the basis of a representative market or field price for the mineral being processed.  Sec. 1.613-4(c), Income Tax Regs.  Where a representative market or field price for a particular mineral cannot be ascertained, the proportionate profits method of computing gross income from

[*10] mining shall be used unless permission to use an alternative method of computation is obtained from the Commissioner. Id. para. (d); see Commissioner v. Portland Cement of Utah, 450 U.S. 156, 160-161 (1981).

"The objective of the 'proportionate profits' method of computation is to ascertain gross income from mining by applying the principle that each dollar of the total costs paid or incurred to produce, sell, and transport the first marketable product * * * earns the same percentage of profit." Sec. 1.613-4(d)(4), Income Tax Regs. Under the proportionate profits method, a fraction, which is the ratio of the taxpayer's mining costs to its total mining and nonmining costs, is applied to the taxpayer's gross sales of the first marketable product, and the product therefrom is treated as the taxpayer's gross income from mining. Sec. 1.613-4(d)(4)(ii), Income Tax Regs. The regulations provide the following formula:

[Mining Costs/Total Costs] × Gross Sales = Gross Income From Mining

Id.

Petitioner's first marketable product is finished cement. In Mitsubishi I we considered which of petitioner's costs for the production of cement could be treated as mining costs for the purpose of applying the proportionate profits formula. The issue that we consider in this opinion is the correct determination of petitioner's gross sales.

[*11] II.　　Determination of Gross Sales

　　A.　　Section 1.613-4(d)(4)(v), Income Tax Regs.

Section 1.613-4(d)(4)(v), Income Tax Regs., provides the following in relevant part with respect to the determination of a taxpayer's gross sales under the proportionate profits method:

> (a) * * * [T]he term "gross sales (actual or constructive)" means the total of the taxpayer's actual competitive sales to others of the first marketable product or group of products, plus the taxpayer's constructive sales of the first marketable product or group of products used or retained for use in his own subsequent operations, subject to the adjustments required by paragraph (e) of this section. See (b) of this subdivision in the case of actual sales between members of controlled groups and in the case of constructive sales. * * *

> (b) * * * In the case of * * * sales between members of a controlled group, and in the case of constructive sales, the prices for such sales shall be determined by use of the principles set forth in paragraph (c) of this section, subject to the adjustments required by paragraph (e) of this section. * * * [Emphasis added.]

The parties agree that petitioner and the MCCD subsidiaries are members of a "controlled group" as that term is used in the regulations. See sec. 1.613-4(j), Income Tax Regs. (definition of controlled group). Therefore, the prices for sales between them should be determined "by use of the principles set forth in" section 1.613-4(c), Income Tax Regs., for determining the representative market or field prices for depletable minerals. Generally, the representative market or field price

[*12] is "the dollar figure or amount which most nearly represents the approximate price at which the taxpayer, in light of market conditions, could have sold * * * [the mineral or finished product at issue]".  Sec. 1.613-4(c)(1), Income Tax Regs.

B.    Representative Market Prices

Generally the regulations direct that a miner-manufacturer such as petitioner determine gross sales used in the proportionate profits method by treating its sales of first marketable product to fellow members of a controlled group as if those sales were made at a representative market price.  Petitioner did not do this for the years in issue.  On its income tax returns it did not attempt to determine market prices for the types of cement that it sold or to apply such prices to the sales that it made to MCCD subsidiaries.  Instead, for each year petitioner used its actual gross sales, $80,325,643 for 2011 and $90,261,779 for 2012, in computing gross income from mining.

Petitioner now contends that it should be allowed to increase gross sales for the purpose of the proportionate profits method by applying the average prices per ton that noncontrolled purchasers paid for its finished cement to its sales to MCCD subsidiaries.  On the basis of that proposed application, it contends that we should determine that its gross sales were $91,116,567 and $100,293,026 for the years in issue, respectively.  An increase in petitioner's gross sales under the

**[\*13]** proportionate profits method would increase its gross income from mining and would, accordingly, increase the amount of its allowable depletion deduction for each year in issue.

Petitioner failed to apply the regulations in its original tax filings, and now it contends that we should apply the regulations to redetermine its gross sales and allow increased deductions. We agree that under the regulations petitioner's gross sales to MCCD subsidiaries should have been determined using representative market prices; specifically, it should have determined and applied market prices for Type II/V cement and Type III cement, which are the two types that it sold to MCCD subsidiaries. However, petitioner bears the burden of establishing gross sales which are greater than those that it first reported and used in computing its deductions and which respondent accepted when petitioner filed the original returns.

Statements on tax returns are admissions that must be overcome by cogent proof. See Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989). Generally the taxpayer bears the burden of proof with respect to any claimed deduction, INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992), and this burden includes establishing the correct amount of the deduction, Clapp v. Commissioner, 321 F.2d 12, 14 (9th Cir. 1963), aff'g 36 T.C. 905 (1961); see also

[*14] sec. 6001; sec. 1.6001-1(a), Income Tax Regs. To meet its burden of proof for the deductions at issue petitioner must prove the representative market prices for its sales to members of the controlled group.

Petitioner contends that we should adopt the weighted averages of the prices of its own sales to noncontrolled purchasers during the years in issue as the representative market prices for Type II/V and Type III cements. The regulations provide that representative market prices are to be ascertained "on the basis of an analysis of actual competitive sales by the taxpayer or others". Sec. 1.613-4(c)(1), Income Tax Regs. "The taxpayer's own actual sales * * * shall be taken into account when establishing market or field prices, provided that those sales are determined to be representative." Id.

Petitioner offered evidence intending to show that its average prices for sales to noncontrolled purchasers represented the market prices for the years in issue. Petitioner's vice president and corporate controller testified about the extent of petitioner's geographical market and the nature of its sales to noncontrolled purchasers. He testified that petitioner faces many competitors in the southern California market that sell Type II/V and Type III cements meeting the same ASTM standards as petitioner's products. He testified that petitioner's prices for

[*15] sales to noncontrolled purchasers are negotiated and that the purchasers are able to buy cement from other producers.

The testimony of petitioner's witness indicates that its sales to noncontrolled purchasers during the years in issue were competitive and negotiated, as opposed to controlled, transactions. However, to rely on petitioner's own sales as a basis for determining market price, we would need to determine also that those sales were "representative" as compared to sales by other producers in the relevant market. See id. At trial petitioner provided three exhibits which report certain aggregated pricing data for cement sales in the United States for the years in issue: (1) the United States Geological Survey's Mineral Yearbook for Cement for each of the years in issue (USGS yearbooks); (2) excerpts from newsletters published by the Engineering News-Record (ENR newsletters); and (3) a screenshot from Statista, an online statistics portal (Statista web page).

Section 1.613-4(c)(3), Income Tax Regs., provides that in the determining a representative market price for the taxpayer's ore or mineral, "consideration shall be given only to prices of ores or minerals of like kind and grade as the taxpayer's * * * and with which, under commercially accepted standards, the taxpayer's ore or mineral would be considered to be in competition". An ore or mineral will be

[*16] considered to be of like kind and grade "if, in common commercial practice, it is sufficiently similar in chemical, mineralogical, or physical characteristics to the taxpayer's ore or mineral that it is used, or is commercially suitable for use, for essentially the same purposes as the uses to which the taxpayer's ore or mineral is put." Sec. 1.613-4(c)(2), Income Tax Regs. Generally, whether an ore or mineral is of like kind and grade will be determined "by reference to industrial or commercial specifications". Id.

Petitioner's witness testified that each of the different types of Portland cement has a unique chemical composition and each is suited to a particular job or use. Each type meets its own set of ASTM standards, which are the industry standards for cement grade and quality. We conclude on the basis of the evidence presented that the various types are not interchangeable in commercial practice. The evidence also shows that the prices charged for the different types vary considerably.

None of the three exhibits listed above provides information for sales that are directly comparable to, and would be useful in analyzing the competitive market for, the sales at issue. The USGS yearbooks provide the averages of the sale prices for all types of Portland cement sold in California and do not disaggregate and provide data for sales of Type II/V cement or Type III cement

[*17] specifically.  The ENR newsletters provide the average sale prices for Type I cement; Type I is a type of Portland cement that petitioner does not sell.  The Statista web page provides the averages of the sale prices for all Portland cements and masonry cement, which petitioner also does not sell.  Like the USGS yearbooks, the Statista web page provides no data on the sale prices for the different types of Portland cement.  Each of the exhibits analyzes sales data and incorporates or reports prices for finished products which are not of the "like kind and grade" of the Type II/V and Type III cements that petitioner sold to noncontrolled purchasers and MCCD subsidiaries.

At trial petitioner's counsel acknowledged that the data in the exhibits could not be used directly to determine a market price for the two types of cement at issue.  He argued that the pricing data is relevant "to show that the price [i.e., the average of petitioner's own sales] * * * is representative in a comparative way".  On brief petitioner contends that "[w]hen compared with the data [in the exhibits] * * * [petitioner's prices] are very reasonable".

We cannot speculate on the reasonableness of petitioner's proposed market prices in the light of the limited data provided.  We reject the contention that the information in the exhibits is relevant "in a comparative way" to determining representative market prices for the sales at issue.  Petitioner has the burden of

[*18] proving those amounts. We are not experts in cement composition and sales practices, and petitioner has not provided information for us to engage in an analysis of the market prices for Type II/V cement or Type III cement as compared to the prices for other cements.

Petitioner failed to establish that its own sales to noncontrolled purchasers were representative of Type II/V and Type III cement sales in petitioner's market for the years in issue. Because we are unable to determine that the sales were representative, we will not take them into account in determining representative market prices. See sec. 1.613-4(c)(2), Income Tax Regs. Petitioner has not met its burden of proving representative market prices for the types of cement that it sold to MCCD subsidiaries. We agree with respondent that petitioner must use the gross sales amounts that it originally reported, i.e., its actual gross sales, to compute gross income from mining under the proportionate profits method.

C.    Applicability of Section 1.613-4(e), Income Tax Regs.

Even if we held that petitioner had proven representative market prices for the cement sales at issue, we conclude that any increases to petitioner's gross sales for the purpose of the proportionate profits method would be offset by adjustments required under the regulations. Section 1.613-4(d)(4)(v), Income Tax Regs., provides that in all cases the determination of gross sales is "subject to the

**[*19]** adjustments required by paragraph (e) of this section."  Section 1.613-4(e)(1), Income Tax Regs., provides that "[i]f a taxpayer computes gross income from mining under the provisions of paragraph (d) * * * discounts actually allowed (if not otherwise taken into account) shall be subtracted from the gross sales (actual or constructive), and shall not be considered a cost, of the first marketable product or group of products."

Petitioner contends that it does not give discounts to purchasers and that no adjustments to gross sales for the years in issue would be warranted under section 1.613-4(e), Income Tax Regs.  However, the parties' stipulations establish that one of the MCCD subsidiaries, Robertson's R/M, paid average prices per ton for Type II/V cement that were substantially lower than the average prices that noncontrolled purchasers paid.  Most of petitioner's gross sales of Type II/V cement for each of the years in issue were sales to Robertson's R/M.  Robertson's R/M also paid less on average for its purchases of Type III cement than did noncontrolled purchasers.

Regardless of whether petitioner labels the price differences "discounts", Robertson's R/M paid less than the prices that petitioner would have us accept as the representative market prices.  Section 1.613-4(e)(1), Income Tax Regs., provides that "[t]he provisions of this subparagraph shall apply to arrangements

[*20] which have the same effect as trade or cash discounts, regardless of the form of the arrangements." Although the arrangement between petitioner and Robertson's R/M may not have been structured or regarded by the parties as a sales discount, the effect was the same. If we adopted petitioner's proposed market prices and applied them to the sales to MCCD subsidiaries, the regulations would require that the recomputed gross sales amounts be reduced to reflect the actual, below-market prices that Robertson's R/M paid for its purchases.

III.   Conclusion

Petitioner argues that the reason that the regulations require a taxpayer to use representative market prices to determine gross sales for sales to members of a controlled group is to prevent the taxpayer from manipulating the prices of controlled sales and increasing its gross income from mining (and the amount of its depletion deduction). It argues that respondent's position in this case, that petitioner must use its actual gross sales to compute gross income from mining, is "short-sighted" because in future cases "the petitioner could inflate its 'actual sales' * * * and take a higher depletion deduction than the regulations clearly intend." Putting aside that petitioner bears the burden of proof with respect to the issue of representative market prices (and has failed to meet that burden), its

**[*21]** argument ignores the manner in which the regulations serve the regulatory objective in cases such as this one.

The regulatory requirement that gross sales to members of a controlled group be reduced to reflect representative market prices prevents the taxpayer from claiming an inflated amount of gross income from mining. Simultaneously, the regulations do not allow the taxpayer to increase gross sales by relying on representative market prices where, as here, it has chosen to give members of the controlled group substantial discounts on its finished products. In either circumstance the regulations operate to prevent the taxpayer from artificially increasing gross sales and the amount of the depletion deduction. Gross sales for the purpose of the proportionate profits method may be adjusted downwards under the regulations, but they may never be adjusted upwards. This result comports with the purpose of the regulations as petitioner interprets it.

Petitioner did not establish representative market prices for its sales to MCCD subsidiaries, and even if it had, we conclude that under applicable regulations petitioner would have been required to reduce gross sales for purposes of calculating gross income from mining to reflect the discounted prices paid for a substantial portion of those sales. In any event, petitioner's gross sales under the proportionate profits method should not be increased.

**[\*22]** Petitioner has not shown that it is entitled to greater depletion deductions than those that respondent would allow on the basis of the stipulations and our holdings in Mitsubishi I. To allow for computations to be submitted in the light of our holdings herein and in the prior opinion,

Decision will be entered

under Rule 155.